8IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NNN 400 CAPITOL CENTER 16, LLC, *et al*[1] | Case No.: 16-12728 (KG) (Jointly Administered) |
| Debtors, | |

NNN 400 CAPITOL CENTER , LLC , NNN 400
CAPITOL CENTER, 1, LLC, NNN 400
CAPITOL CENTER, 2, LLC, NNN 400
CAPITOL CENTER 3, LLC, NNN 400          Adv. No. 18-_____(KG)
CAPITOL CENTER 4, LLC, NNN 400
CAPITOL CENTER 5, LLC, NNN 400
CAPITOL CENTER 6, LLC, NNN 400
CAPITOL CENTER 7, LLC, NNN 400
CAPITOL CENTER 8, LLC,NNN 400
CAPITOL CENTER 9, LLC, NNN 400
CAPITOL CENTER 10, LLC, NNN 400
CAPITOL CENTER 11, LLC, NNN 400
CAPITOL CENTER 12, LLC, NNN 400
CAPITOL CENTER 13, LLC, NNN 400
CAPITOL CENTER 14, LLC, NNN 400
CAPITOL CENTER 15, LLC, NNN 400
CAPITOL CENTER 16, LLC, NNN 400
CAPITOL CENTER 17, LLC, NNN 400
CAPITOL CENTER 18, LLC, NNN 400
CAPITOL CENTER 19, LLC, NNN 400

---

[1] The debtors in these cases are: NNN 400 Capitol Center, LLC, Case No. 17-11250 (KG); NNN 400 Capitol Center 1, LLC, Case No. 17-11251 (KG); NNN 400 Capitol Center 2, LLC, Case No. 16-12741 (KG); NNN 400 Capitol Center 3, LLC, Case No. 16-12750 (KG); NNN 400 Capitol Center 4, LLC, Case No. 16-12752 (KG); NNN 400 Capitol Center 5, LLC, Case No. 16-12753 (KG); NNN 400 Capitol Center 6, LLC, Case No. 16-12754 (KG); NNN 400 Capitol Center 7, LLC, Case No. 17-11253 (KG); NNN 400 Capitol Center 8, LLC, Case No. 17-11254 (KG); NNN 400 CAPITOL 400 Capitol Center 9, LLC, Case No. 16-12755 (KG); NNN 400 Capitol Center 10, LLC, Case No. 16-12730 (KG); NNN 400 Capitol Center 11, LLC, Case No. 16-12731 (KG); NNN 400 Capitol Center 12, LLC, Case No. 16-12732 (KG); NNN 400 Capitol Center 13, LLC, Case No. 16-12733 (KG); NNN 400 Capitol Center 14, LLC, Case No. 16-12735 (KG); NNN 400 Capitol Center 15, LLC, Case No. 16-12736 (KG); NNN 400 Capitol Center 16, LLC, Case No. 16-12728 (KG); NNN 400 Capitol Center 17, LLC, Case No. 16-12737 (KG); NNN 400 Capitol Center 18, LLC, Case No. 16-12738 (KG); NNN 400 Capitol Center 19, LLC, Case No. 16-12739 (KG); NNN 400 Capitol Center 20, LLC, Case No. 16-12742 (KG); NNN 400 Capitol Center 21, LLC, Case No. 16-12743 (KG); NNN 400 Capitol Center 22, LLC, Case No. 16-12744 (KG); NNN 400 Capitol Center 24, LLC, Case No. 16-12746 (KG); NNN 400 Capitol Center 25, LLC, Case No. 17-11258 (KG); NNN 400 Capitol Center 26, LLC, Case No. 16-12747 (KG); NNN 400 Capitol Center 27, LLC, Case No. 16-12748 (KG); NNN 400 Capitol Center 28, LLC, Case No. 16-12749 (KG); NNN 400 Capitol Center 30, LLC, Case No. 17-11255 (KG); NNN 400 Capitol Center 32, LLC, Case No. 16-12751 (KG); NNN 400 Capitol Center 35, LLC, Case No. 17-11256 (KG); and NNN 400 Capitol Center 36, LLC, Case No. 17-11257 (KG).

CAPITOL CENTER 20, LLC, NNN 400
CAPITOL CENTER 21, LLC, NNN 400
CAPITOL CENTER 22, LLC, NNN 400
CAPITOL CENTER 24, LLC, NNN 400
CAPITOL CENTER 25, LLC, NNN 400
CAPITOL CENTER 26, LLC, NNN 400
CAPITOL CENTER 27, LLC, NNN 400
CAPITOL CENTER 28, LLC, NNN 400
CAPITOL CENTER 30, LLC, NNN 400
CAPITOL CENTER 32, LLC, NNN 400
CAPITOL CENTER 35, LLC, NNN 400
CAPITOL CENTER 36, LLC,

     Plaintiffs,

v.

WELLS FARGO BANK, N.A., AS TRUSTEE
FOR THE REGISTERED HOLDERS OF COMM
2006-C8 COMMERCIAL MORTGAGE PASS-
THROUGH CERTIFICATES; LNR PARTNERS,
LLC, a Florida Limited Liability Company;
BERKADIA COMMERCIAL MORTGAGE,
LLC, a Delaware Limited Liability Corporation;
LITTLE ROCK-400 WEST CAPITOL TRUST, a
Delaware Statutory Trust; SOMERA ROAD,
INC., a New York Corporation and TACONIC
CAPITAL ADVISORS, LP, a Delaware Limited
Partnership.

     Defendants.

## COMPLAINT

Plaintiffs, NNN 400 CAPITOL CENTER, LLC, NNN 400 CAPITOL CENTER, 1, LLC,

NNN 400 CAPITOL CENTER, 2, LLC, NNN 400 CAPITOL CENTER 3, LLC, NNN 400

CAPITOL CENTER 4, LLC, NNN 400 CAPITOL CENTER 5, LLC, NNN 400 CAPITOL

CENTER 6, LLC, NNN 400 CAPITOL CENTER, 7, LLC, NNN 400 CAPITOL CENTER, 8, LLC,

NNN 400 CAPITOL CENTER 9, LLC, NNN 400 CAPITOL CENTER 10, LLC, NNN 400

CAPITOL CENTER 11, LLC, NNN 400 CAPITOL CENTER 12, LLC, NNN 400 CAPITOL

CENTER 13, LLC, NNN 400 CAPITOL CENTER 14, LLC, NNN 400 CAPITOL CENTER 15,

LLC, NNN 400, CAPITOL CENTER 16, LLC, NNN 400 CAPITOL CENTER 17, LLC, NNN 400 CAPITOL CENTER 18, LLC, NNN 400 CAPITOL CENTER 19, LLC, NNN 400 CAPITOL CENTER 20, LLC, NNN 400 CAPITOL CENTER 21, LLC, NNN 400 CAPITOL CENTER 22, LLC, NNN 400 CAPITOL CENTER 24, LLC, NNN 400 CAPITOL CENTER, 25, LLC, NNN 400 CAPITOL CENTER 26, LLC, NNN 400 CAPITOL CENTER 27, LLC, NNN 400 CAPITOL CENTER 28, LLC, NNN 400 CAPITOL CENTER, 30, LLC, NNN 400 CAPITOL CENTER 32, LLC, NNN 400 CAPITOL CENTER, 35, LLC, and NNN 400 CAPITOL CENTER, 36, LLC by and through their undersigned counsel, hereby sue Defendants, WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF COMM 2006-C8 COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES ("Wells Fargo"), LNR PARTNERS, LLC ("LNR"), BERKADIA COMMERCIAL MORTGAGE, LLC ("Berkadia"), LITTLE ROCK-400 WEST CAPITOL TRUST ("Little Rock-400"), SOMERA ROAD, INC. ("Somera"), and **TACONIC CAPITAL ADVISORS, LP** ("Taconic"), and allege as follows:

## PRELIMINARY STATEMENT

1.      Prior to the filing of the petitions in these jointly administered bankruptcy cases, Plaintiffs were borrowers under a commercial real estate loan with Wells Fargo.  Wells Fargo assigned loan to Little Rock-400 during the pendency of these cases.

2.      It is standard industry practice for commercial lenders and their loan servicers to work with their borrowers fairly and in good faith, within the parameters of the loan documents, to ensure that the borrowers can timely make their periodic loan payments and ultimately satisfy the indebtedness at maturity.  For example, in real estate based lending, it is standard practice for lenders and their servicers to promptly release reserve funds upon the borrower's request so that appropriate property-related expenses can be timely paid, to promptly approve leases that

reasonably should be approved so the borrower's income can be maximized and to promptly provide an accurate payoff statement and otherwise cooperate with new lenders, so the loan can be satisfied through a refinancing.  In essence, the industry standard requires a true spirit of cooperation between the lender and borrower, so the borrower's business is not harmed, the circumstances for loan repayment are optimized and the lender can earn its bargained-for profit.

3.     The actions of Wells Fargo and its servicers pertinent to Plaintiffs' loan lay in sharp contrast to the industry standard summarized above.  Wells Fargo and its servicers eschewed any notion of good faith or fairness and intentionally created multiple impediments to Plaintiffs' performance of its loan obligations with the goal of forcing Plaintiffs into default.  For example, as more fully described below, Wells Fargo and its servicers refused to release Plaintiffs' own reserve funds despite its contractual obligation to do so, hindering the ability to timely pay property-related expenses; refused to approve leases that clearly should have been approved, imposing great financial stress on the property and refused to provide a timely and accurate payoff statement, destroying a pending transaction with a new lender to refinance of loan.  These actions were taken with the specific intent of imposing a severe financial burden on Plaintiffs and of conjuring up defaults under the loan documents with the specific the intent of using such defaults as a pretext to recover massive penalties from Plaintiffs, to block refinancing opportunities and to rob Plaintiffs of the equity in their property.  On information and belief, these actions are not an isolated incident but part of a widespread and longstanding practice of Wells Fargo and its servicers to force borrowers into artificial defaults and then to exact illegal penalties from them and steal their equity. On information and belief, Plaintiffs are only one of many victims of these predatory practices.

4.      The assignment of the loan to Little Rock-400 was wrongfully orchestrated by Somera and Taconic through their blatant theft of confidential information they deceivingly obtained from Plaintiffs.

5.      Plaintiffs accordingly bring this action against Wells Fargo, LNR and Berkadia to recover money damages for breach of contract, negligence, tortious interference and aiding and abetting tortious interference and to obtain declaratory relief.    Plaintiffs are also suing Somera and Taconic for their role in stealing confidential information which caused the loan to be assigned to Little Rock-400 and inflicted severe financial harm on Plaintiffs in the process while unjustly enriching Somera and Taconic.

6.      Plaintiffs comprise a group of individual limited liability companies created to acquire and own an undivided interest in real estate located at 400 W. Capitol Ave., Little Rock, Arkansas ("Property") as an investment in connection with an Internal Revenue Code Section 1031 tax deferred exchange.   A 547,000 square foot commercial office building known as "Regions Center" is situated on the Property.  Regions Center is occupied by multiple tenants under various commercial office leases.

7.      Each Plaintiff acquired an undivided tenant-in-common ("TIC") interest in the Property. The TIC structure has been developed to facilitate investments in real estate in connection with Section1031 exchange transactions.

8.      Each Plaintiff is party to a Tenants-in-Common Agreement ("TIC Agreement") that, *inter alia*: (1) provides for the appointment of an asset manager, (2) establishes the parties' voting rights and transfer rights and (3) outlines the allocation of income and expenses.   Each Plaintiff was a party to a Property and Asset Management Agreement with FGG, Inc. d/b/a First Guardian Group ("FGG") which provided for the management, leasing, operating and maintaining

of the Property ("Management Agreement") by FGG as the asset manager ("Asset Manager").

Under the terms of that Management Agreement, the day to day operations of the Property were

performed by a property manager, Moses Tucker Real Estate ("Property Manager"). The

Management Agreement with FGG was terminated effective December 31, 2016. Moses Tucker

Real Estate, Inc. ("MTRE") is now Asset and Property Manager under the authority of the

Bankruptcy Court.

        9.     The Property is encumbered by a Mortgage, Assignment of Leases and Rents,

Security Agreement and Fixture Filing dated August 18, 2006 and related documents and

instruments (collectively, "Mortgage"). The Mortgage secures the obligations of the TIC investors

under a promissory note related to the Mortgage dated August 18, 2006 in the original principal

amount of $32,000,000.00 ("Note") and arises out of that certain Loan Agreement dated as of

August 18, 2006 ("Loan Agreement"). The Mortgage, Note, Loan Agreement and related

documents are referred to herein as the "Loan Documents." Whether as an original borrower under

the Note or pursuant to subsequent assignment and assumption agreements, each Plaintiff is a

borrower under the Note and a party to the Loan Documents. In total, there are thirty-two (32)

separate TIC investors that hold an ownership interest in the Property and that are parties to the

Loan Documents (collectively, "Borrowers"). The percentage of ownership each TIC holds varies

and ranges from 0.90% to 9.25%.

        10.    As of the filing of this complaint, all of the thirty-two (32) TICs have filed petitions

for relief under Chapter 11 of the Bankruptcy Code, representing 100% of the ownership of the

Property. These Chapter 11 cases are being jointly administered before the Court under the main

case caption set forth above. These thirty-two (32) TIC investors are Plaintiffs herein.

        11.    The current lender under the Loan Documents is Little Rock-400.

12.     The maturity date of the loan under the Note was September 1, 2016 ("Maturity Date").  The Borrowers were in the process of refinancing the loan in advance of the Maturity Date.  However, as set forth in detail below, Wells Fargo, Berkadia and LNR intentionally thwarted the refinancing and directly caused the refinancing not to occur as part of their consistent effort to force the loan into default.  Not only did this cause a purported default under the Loan Documents, it also led to the Property losing a significant new tenant, substantially diminishing the value of the Property and much needed cash flow for its operations.

13.     On November 8, 2016, Wells Fargo filed a Verified Complaint for Foreclosure, Replevin, and Other Relief and Emergency Appointment of Receiver against Plaintiffs and the other TICs in the Circuit Court of Pulaski County, Arkansas, commencing Case No. 60CV-16-6167 therein (the "Foreclosure and Receiver Action").  The basis of the Foreclosure and Receiver Action is the alleged failure to refinance the loan and the purported default.  The Foreclosure and Receiver Action has been stayed as a result of the filing of these bankruptcy cases.

14.     Throughout much of the history of the loan, Wells Fargo utilized Berkadia as servicer of the loan.  Servicing of the loan was later transferred to LNR as the "special servicer."

15.     On June 13, 2017, the Mortgage was assigned to Little Rock-400 which assumed the liabilities under the loan.

## PARTIES

16.      Plaintiffs are Delaware limited liability companies with their principal place of business in Little Rock, Arkansas.

17.     Wells Fargo is a national banking association having its principal place of business in Columbia, Maryland.

18.     LNR is a commercial mortgage special servicer acting on behalf of Wells Fargo and having its principal place of business in Miami Beach, Florida.

19.     Berkadia is a commercial mortgage servicer acting on behalf of Wells Fargo and having its principal place of business in Ambler, Pennsylvania.

20.     Little Rock-400 West Capitol Trust is a Statutory Trust formed in Delaware.

21.     Taconic is the beneficial owner of Little Rock-400, having its principal place of business in New York, New York.

22.     Somera is the commercial real estate investment firm, having its principal place of business in New York, New York.

23.     Taconic and Somera are affiliates. They have common agents and representatives, regularly do business together for a common purpose, and to promote their own allied business interests by working together to acquired distressed real estate properties in the United States.

## JURISDICTION AND VENUE

24.     This is an adversary proceeding for the purpose of determining an actual controversy between the parties and for money damages exceeding $75,000.00.  This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334 and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

25.     This matter is a core proceeding.

26.     Venue of this adversary proceeding is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## STATEMENT OF FACTS

27.     Borrowers purchased the Property pursuant to the TIC Agreement effective August 18, 2006 using commercial financing through Bank of America, N.A.  The documents evidencing

the financing included the Note, Mortgage and Loan Agreement, true copies of which are attached hereto as Exhibits A, B and C respectively.

28.    Bank of America subsequently assigned the Mortgage and Note to LaSalle Bank, N.A. on September 25, 2006.  A true copy of this assignment is attached hereto as Exhibit D. LaSalle Bank then assigned the Mortgage and Note to Wells Fargo effective January 2, 2008.  A true copy of this assignment is attached hereto as Exhibit E.

29.    The loan was serviced on behalf of Wells Fargo by Berkadia.

30.    Throughout the history of the loan, Wells Fargo and its servicers dealt with Borrowers unfairly and in bad faith and engaged in a course of conduct that demonstrated their clear intention to impede Borrowers' performance under the Loan Documents and to force the loan into an artificial default so that illegal penalties could be exacted and the equity in the Property could be taken for the benefit of Wells Fargo.

31.    Berkadia directly and repeatedly impeded Borrowers' performance under the Loan Documents by refusing to provide approvals for new or renewed leases within any time frame that could be considered commercially reasonable.

32.    For example, Asset Manager informed Berkadia of the specific terms for a lease with RGN-Little Rock 1, LLC ("Regus Lease") on May 21, 2015.  The lease was approved by the tenant and Asset Manager in mid-September 2015 and sent to Berkadia for approval.  On September 30, 2015, Asset Manager received responses from Helene Vishio, Client Services Manager at Berkadia, and separately from the Lease Review Requests Group, each with questions.  Asset Manager responded to those questions on October 5, 2015 and on October 7th was advised the issues were being sent to Special Servicer (LNR) for review.  To avoid losing a major tenant, Asset Manager

executed the Regus Lease after it threatened to walk away due to Wells Fargo's delayed response. The Regus Lease was finally approved by LNR on April 8, 2016.

33.     Berkadia also directly and repeatedly impeded Borrowers' performance under the Loan Documents by refusing to provide approvals of requests for the release of reserve account funds for tenant improvements, property repairs, leasing commissions, upkeep and other reserve account disbursements allowed under the Loan Documents within any time frame that could be considered commercially reasonable.

34.     For example, on or about November 30, 2015, Asset Manager submitted requests to Berkadia for disbursement from reserve accounts for leasing commissions due pursuant to the Regus Lease.   These requests were not approved until 2016. The inability to pay leasing commissions created stress on the property, requiring use of Borrowers' cash flow for purposes for which it was not intended.   Borrowers expected to negotiate leases for new tenants beginning in March 2016 for over 9,000 square feet of the Property.   Failure to pay the leasing agent promptly created a stigma on the Property in the leasing market and impaired Plaintiffs' ability to market and lease that available space through the loss of that leasing agent.

35.     In another instance, Property Manager requested $532,632.54 to be released from lender held reserve accounts for tenant improvements and leasing commissions on April 26, 2016. In response, on April 27 and May 4, 2016, Berkadia requested the application package be resubmitted in a different manner.   The package was resubmitted that same day but on May 18, 2016 the request still had not been funded.   With its resubmittal, Property Manager informed Berkadia the funds were urgently needed so that the Property's cash flow would not be compromised.   On May 20, 2016, Berkadia responded with a request for additional documentation which was provided on May 26th and May 31st.   On June 7th Berkadia, finally responded by stating

they were releasing only partial funds, in part, because one of the leases pertaining to those funds was still being held for approval by Wells Fargo.

36.     As the loan maturity date came closer, Wells Fargo impermissibly stopped agreeing to release any reserve account funds, citing the close proximity to maturity. There was no basis in the Loan Documents for denying release of funds based on proximity to maturity.  As a result, Borrowers were forced to use funds from the Property's cash operating account to avoid defaulting on existing Wells Fargo approved leases to avoid potential lawsuits that would arise in the event of such defaults.  Wells Fargo now claims this use of funds as an event of default and claims these funds as part of their secured interest in the collateral.

37.     Excessive delays such as these were carried out with specific intent of putting a financial stress on the Borrowers' business the with goal of forcing the loan into default.  On information and belief, these delays are part of widespread pattern and practice through which many borrowers have been victimized.

38.     In early 2014, Borrowers decided to appoint FGG as the Asset Manager in place of a prior asset manager.  Multiple Borrowers advised Berkadia of their intent to change asset managers in early 2014.  FGG immediately notified Berkadia of this change and requested Wells Fargo's consent to the change.  In response, on October 14, 2014, LNR issued a "pre-negotiation letter" to FGG requesting, among other things, (a) financial statements from each Borrower prepared within 30 days of the date of the pre-negotiation letter, (b) three (3) years of certified financial statements from the key principals of the proposed asset manager, (c) federal tax returns for the past three (3) years from the key principals of the proposed asset manager, (d) references and a list of all loans in which the key principals of the proposed asset manager had an interest and (e) consent to credit background checks for the key principals of the proposed asset manager.

Plaintiffs and FGG agreed to provide the items requested in items (b) through (e) as to FGG but not as to its key principals as such requests were clearly overreaching and not necessary to approve a new management company.

39.     On October 15, 2014, LNR also requested an application/processing fee, third party fee deposit and legal retainer for the Lender's approval process for change of the Asset Manager. Borrowers promptly paid LNR $21,500 on October 24, 2014 for the requested fees and contemporaneously paid $7,500 for the requested legal retainer to Bilzin Sumberg Baena Price & Axelrod LLP (counsel for LNR).

40.     On November 18, 2014, Borrowers informed LNR it would accept the terms of the pre-negotiation letter except for the objectionable portion mentioned above.  LNR responded the following day, stating the requested revisions would be reviewed internally.   The next communication from LNR was April 21, 2015 requesting the signed pre-negotiation letter without any reference to the objectionable portion of the letter.  FGG and Plaintiffs responded on May 13th, again asking LNR to review the requested changes to the letter.  To date, neither FGG nor Borrowers have ever received any further communications from LNR (nor any of Wells Fargo's representatives) addressing the requested consent to change in the asset manager.  In fact, LNR would later claim that it was unaware of any requested consent to such a change.

41.     Since FGG was appointed Asset Manager, Berkadia, LNR and Wells Fargo treated FGG as Asset Manager by communicating with FGG as to requests for release of reserve funds for tenant and other capital improvements, approval of leases and other property management related issues, until termination of the Property Management Agreement on December 31, 2016.

42.     The Loan Agreement specifically states that Wells Fargo's consent to a change in property management should not be unreasonably withheld, conditioned or delayed. (Loan

Agreement, § 5.14(d)).   As demonstrated above, Wells Fargo blatantly disregarded this contractual obligation.

43.     On April 25, 2016, Berkadia inquired with Property Manager regarding plans for dealing with maturity of the loan which would occur September 1, 2016.  Immediately upon receipt of that inquiry, Property Manager responded, informing Berkadia the Borrowers were interested in re-financing the loan with Berkadia (which is affiliated with KeyBank) but that no one from Berkadia had been in touch with them yet.  Berkadia replied that it would look into the issue and respond.

44.     On April 29, 2016, Berkadia replied that it was interested in discussing a refinancing and that their portfolio retention department would be in touch the following week.  However, as of June 28, 2016, no one from Berkadia had made any communication to anyone connected to Borrowers to discuss refinancing.  Due to the complete lack of communication from Berkadia, Borrowers sought and obtained alternate financing through a different CMBS lender, UBS.  It is now clear the failure of Berkadia communicate with Borrowers regarding the refinancing was part of the scheme to leave Borrowers without a refinancing option upon maturity of the loan and to force the loan into default.

45.     On June 29, 2016, Berkadia offered to provide Borrowers with a payoff statement for the loan and cited a 30-day notice period requirement of the Loan Documents.  There is no such requirement in the Loan Documents.  Borrowers responded immediately by requesting a payoff statement effective August 15, 2016.  In response, Berkadia sent an estimated payoff statement on July 12th, noting now that the Loan Documents required a 60-day notice period and that a final payoff statement would be provided once the August 1st debt service payment was made.

46.     On August 23, 2016, Borrowers requested a final payoff statement, netting out all reserve accounts, effective August 31st.  Borrowers specifically advised Berkadia that a closing on the new loan was set for the end of that month.  In response, Berkadia raised for the first time an issue regarding a mezzanine loan that was part of the initial loan package with Bank of America, stating the payoff could not be approved without confirmation that mezzanine loan had been paid. The maturity date for that mezzanine loan was November 2006 – well before the Mortgage was assumed by Wells Fargo - and Wells Fargo was well aware that the mezzanine loan had been satisfied prior to Wells Fargo assuming the Mortgage.  Upon investigation by Borrowers, it was discovered Bank of America had never properly filed a Satisfaction of the mezzanine loan. Borrowers provided Berkadia with a title insurance commitment, prepared for the refinancing, evidencing the mezzanine loan pay off.  Borrowers did not receive any further communication from Berkadia or Wells Fargo in this regard.

47.     Due to outside complications beyond Borrowers' control, the closing on the refinancing was delayed until September 19, 2016.  Borrowers advised Berkadia of this delay on August 30th.  Borrowers extended an offer to Berkadia to speak with the new lender for assurances the new loan would go through.  In response, Berkadia advised that late fees and default interest accrue for each day after the September 1st maturity date that the loan was not paid off but stating it could request permission to refrain from transferring the loan to the special servicer (LNR) upon receipt of the new loan commitment letter.  Since UBS does not issue commitment letters for CMBS loans in its standard course of business, Borrowers responded by providing direct contact information for the UBS representative overseeing the refinancing, so that Wells Fargo could receive appropriate assurances the new loan would close on September 19th.

48.     Even though some of the delay in the refinancing process was caused by Wells Fargo and Berkadia, borrowers were ready, willing and able to pay the reasonable default interest and associated legal fees caused by the delayed closing on the refinancing in the initial 30 days after maturity of the note.

49.     On September 2, 2016, Berkadia sent a Maturity Default Notice to Borrowers. Borrowers then requested Berkadia delay transferring the loan to the special servicer (LNR) as Berkadia was aware the closing on the new loan would take place that month. Borrowers also reiterated the request for a payoff statement so that this closing could take place as scheduled.  In response, Berkadia advised they could not delay the transfer to the special servicer despite common industry practice to not transfer to a special servicer when a refinancing of the loan is imminent.

50.     Berkadia advised on September 7, 2016 that they could request a delay of 30 days on the transfer of the loan to the special servicer if it was provided with a commitment letter for the new loan.  However, Berkadia had already been in communication with the special servicer, LNR, at that point.  LNR conditioned the transfer delay on payment of $209,252.59 in principal and interest before they would review the request to delay the transfer.  Borrowers was understandably leery of making any such payment with no guarantee Wells Fargo would agree to delay the transfer.

51.     On September 12, 2016, Berkadia again refused to provide a payoff statement for the new loan closing.

52.     LNR sent a letter to Borrowers dated September 22, 2016, via regular mail, stating that servicing of the loan had been transferred to LNR as special servicer.  Despite the exigent circumstances, the letter was not addressed or delivered to counsel who had been in communications with the Berkadia, but rather was "mailed" to the address of record and was not received until September 28, 2016.  LNR also sent Borrowers a pre-negotiation letter and a default letter.  Rather

than stating the amount due on the loan as a typical default letter would, the letter stated that the payoff amount for the loan would be provided "upon request" – despite the fact Borrowers had been requesting a payoff statement for over a month.  The following day Borrowers advised Berkadia the closing was now scheduled to take place on September 30, 2016 and again requested a payoff letter, so the closing could move forward.  As of September 26, 2016, a payoff statement had still not been issued.  Borrowers then followed up on the status of the payoff statement status with Berkadia and were advised to contact LNR since the loan was now with the special servicer.  However, no contact information for any LNR representative was provided.  On September 28th, Borrowers still had not received any payoff letter from Berkadia or LNR.  Borrowers again communicated with Berkadia reiterating the request for the payoff letter and making clear the new loan was being threatened by not having one.

53.    Also, on September 28th Borrowers advised Berkadia of a new lease with a major tenant, "Mitchell Williams," a large law firm that would occupy three floors of the building.  Borrowers advised Berkadia the lease was set to automatically terminate if the refinancing did not take place on September 30th as scheduled.  The lease with Mitchell Williams added more than $5,000,000.00 in value to the property and was a condition of the new loan with Calmwater Capital.  Any termination of that lease would cause the new loan to fail.  In response, Berkadia again referred Borrowers to LNR.

54.    LNR finally reached out to Borrowers on September 28, 2016.  Borrowers made yet another request for a payoff statement, making clear it was needed immediately.  LNR replied stating it would request a payoff statement but typically rush requests would take 5 business days to process.  LNR made this statement despite the fact that default notices had been sent to Borrowers stating the payoff statement would be provided "upon request."  The following day, at 4:25 PM,

LNR advised Borrowers it would forward a payoff statement as soon as it was available.  Borrowers reminded LNR of the imminent termination of the Mitchell Williams lease and that any such termination would kill the refinancing of the loan and that the need for the payoff statement was therefore urgent.  With full knowledge of the imminent termination of the Mitchell Williams lease, LNR refrained from sending the payoff statement to Borrowers until 8:08 PM on September 30th – after close of business – at which time it was impossible to close on the new loan as scheduled.

55.     The belated payoff statement shockingly contained an illegal "late payment charge" that added over $1.2 Million to the payoff amount.  This late charge so increased the loan debt as to make the new loan insufficient to cover the payoff amount, effectively ending the possibility of refinancing with the new lender.  Accordingly, the Mitchell Williams lease was terminated shortly thereafter, devaluing the building by over $5,000,000.00.  If Borrowers had received a proper payoff statement in time, the closing on the new loan would have gone forward, and Mitchell Williams would have been bound by their lease.  Accordingly, Borrowers lost the value the Mitchell Williams lease added to the Property as well as the funds advanced on due diligence and related matters for the new loan.

56.     Despite the foregoing, Borrowers continued to pursue refinancing options to pay off the original Mortgage.  Borrowers promptly demanded that Wells Fargo remove the impermissible late charge.  In response, on October 4, 2016, LNR offered to waive 50% of the late charge and extend the payment deadline to October 7th.  Then, on October 6, 2016, LNR offered to lower the late charge to $300,000.  After continued discussions, on October 7th Wells Fargo finally issued a new payoff statement completely removing the illegal late charge.

57.     On October 13, 2016, Borrowers requested that Wells Fargo approve a lease for two floors of the building to a tenant under contract, Wilson & Associates ("Wilson") by, October 14th;

otherwise the lease would expire.  The new lease with Wilson would add an approximate value of $2,000,000.00 to the Property.  Upon agreement with Wilson, Borrowers were able to extend the response deadline to October 19th.  Borrowers even requested a telephone call between the leasing agent and an LNR representative to discuss the lease.  In response, LNR sent a letter on October 18th stating it was under no obligation to approve the lease but would review it upon receipt of further documentation and remittance of all rents received since loan maturity.  Additionally, LNR refused to respond by October 19th calling the deadline unreasonable and unworkable, and further refused to allow a telephone call between the leasing agent and an LNR representative, stating it would not be productive.

58.    The following morning, on October 19th, Borrowers provided LNR with the requested documents and information required for Wells Fargo review of the Wilson lease. Borrowers advised LNR that Berkadia had previously established a procedure of paying for tenant improvements and leasing commissions from the cash flow and then seeking reimbursement from the lender held reserves, specifically noting that all cash flow advances of tenant improvement and leasing commissions payments, both before and after loan maturity, were made and based upon lender approved leases.  LNR was further informed that Berkadia had arbitrarily decided not to release reserve funds prior to loan maturity as the maturity date was too close in their opinion.  LNR responded that the Borrowers had improperly used post loan maturity rents for their own use. Notwithstanding a denial of this allegation, the Borrower responded that had the pre-maturity reimbursements not been improperly withheld, Borrowers would have had sufficient cash flow to make payments for necessary operating expenses, including tenant improvement and leasing commission payments that were due as part of its contractual obligations.

59.     On October 20th, LNR reported that the Wilson lease was under review, but it would take time.  Borrowers responded that the initial lease deadline had already expired but that Wilson agreed to consider extending the term if Wells Fargo approved the lease.  Wilson informed Borrowers it would be seeking space in another building while it awaited Wells Fargo's decision and would leave the Property if it found suitable space elsewhere before the lease approval was given.  Given the value of the Wilson lease (approximately $2,000,000.00), loss of that lease would have ended any possibility for Borrowers to refinance the loan.

60.     Over the following week, LNR kept the Wilson lease in the review process, requesting further information on October 26, 2016 and asking for the first time for evidence of Wells Fargo's consent to the change in management to FGG.  After more discussions between counsel, Wells Fargo approved the Wilson lease subject to certain conditions, including payment of Wells Fargo's legal fees and expenses "incurred in connection with the review and processing of the Wilson Lease."

61.     Borrowers responded to Wells Fargo's conditions on October 31st, agreeing to change the requested lease language, providing requested information and requesting that Wells Fargo agree to use lender held reserve funds to pay for the tenant improvements and leasing commissions due under the Wilson lease, as Borrowers were unable to pay those fees out of the cash flow account and were unable to locate financing that would cover the fees until after completion of a refinancing event.  A subsequent email was sent on November 1st, detailing Wells Fargo's acts which led to a cash deficit which forced Borrower to use its cash flow to pay the tenant improvements and leasing commissions then due so as to avoid breaching multiple leases.  In this email, Borrowers again requested Wells Fargo strongly consider use of lender held reserve funds to pay the tenant improvements and leasing commissions due under the Wilson lease, specifically

noting Wilson would sign a lease with a different property the next day if Wells Fargo approval was not immediately forthcoming.

62.     In response, LNR requested yet more documentation and information for its review of the Wilson lease and to consider releasing lender held reserve funds to pay for the tenant improvements and leasing commissions due under that lease.  Fortunately, Borrowers were able to persuade Wilson to accept another brief extension of its lease deadline based upon LNR's conditional approval letter.  On November 3rd, Borrowers responded to LNR's latest information requests, reiterating there were no other immediate sources for payment of the Wilson lease tenant improvements and leasing commissions and requesting Wells Fargo's response by 12:00 PM November 4th, that being the extended deadline set in place by Wilson.

63.     LNR again responded with more questions and requests for documents, some of which had already been provided.  On November 4th, LNR sent a letter requesting identification of the alternate property/lease Wilson was considering, objecting to certain portions of the lease, alleging Borrowers' unauthorized use of rents and again raising the issue of Wells Fargo consent to the management change to FGG – consent of which was presumably still in the review process with Wells Fargo.

64.     Further communications were exchanged between the parties over the following days and, at the request of Borrowers, Wilson again agreed to a brief extension to resolve the lease issues with Wells Fargo.  Finally, on November 7th, Wells Fargo agreed to fund $689,180.61 of tenant improvement and leasing commission costs for the Wilson lease from available Wells Fargo held reserve funds out of the $1,059,938.34 requested.  Wells Fargo refused to release $370,757.73 of the necessary funds due to Borrowers' payment from cash accounts of funds needed for refinancing lender and legal costs, as they were not "used for necessary operating expenses

following the Maturity Date." In order to keep the Wilson lease, and the value it added to the Property, Borrowers had to agree to fund the tenant improvement and leasing commission costs out of its individual owners' funds.

65.     Prior to its attempts to refinance the loan, in May 2016, the TICs voted to perform a roll-up of all individual TIC entities into a single newly created limited liability company, through an exchange under section 721 of the Internal Revenue Code.  To that end, 400 Capitol Center Holdings, LLC was created as a Delaware Limited Liability Company on July 29, 2016.

66.     Borrowers' intent was to transfer the Property to the new LLC at the refinancing of the loan.  Through this process, the remaining owners of 400 Capitol Center Holdings, LLC would have possessed a more valuable membership interest than that currently held in their individual TIC LLC, in part through the addition of the value from the Mitchell Williams lease.

67.     Borrowers were first approached by Somera on December 15, 2016 and later began discussions with Somera in March 2017. The purpose of these discussions was for Somera, to locate a financially qualified potential partner, to acquire the Note from Wells Fargo under terms favorable to Borrowers and in such a manner that a mutual benefit would inure to both Borrowers and Somera.  To that end, Plaintiffs and Somera entered into a Master Confidentiality Agreement in which they agreed to keep all information about the Property and the loan confidential.  A true copy of the Master Confidentiality Agreement is attached as Exhibit F.

68.     The Master Confidentiality Agreement specifically forbade Somera from using any confidential information "(a) for its own benefit, (b) for the benefit of any third party, or (c) to Provider's detriment."  (Master Confidentiality Agreement, Para. 3)

69.     Under this Confidentiality Agreement, Somera agreed it would not

(a) enter into any oral or written agreement or arrangement of any kind for or in connection with a Proposed Transaction, (b) initiate maintain or respond to any

contact with the owner of the underlying property or any note secured thereby the underlying property relating to the Proposed Transaction, any obligor or borrower related to the Proposed Transaction, or any of the respective employees or representatives of the foregoing (except in the ordinary course of business unrelated to the Proposed Transaction), or (c) otherwise circumvent or undermine the Provider's opportunity with respect to the Proposed Transaction.

(Master Confidentiality Agreement, Para. 8)

70.     Pursuant to the Agreement, Borrowers delivered to Somera on March 10, 2017 a Schedule which specifically listed the loan with Wells Fargo as a Proposed Transaction and made the loan and loan- related information subject to confidentiality under the Master Confidentiality Agreement.  This Schedule was executed by a duly authorized representative of Somera.  A true copy of the Schedule is attached hereto as Exhibit G.

71.     In blatant violation of the Master Confidentiality Agreement, Somera used the confidential information it obtained from Borrowers to negotiate and procure a sale of the loan to Little Rock-400, a trust ultimately owned by Taconic, in June 2017.  An Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing was then recorded in the Pulaski County, Arkansas official records on June 14, 2017, in furtherance of the transaction.

72.     Subsequent to these events, Borrowers discovered that Somera was secretly working in concert with Taconic when it entered into the Master Confidentiality Agreement, stole the confidential information regarding the loan and brought about the assignment of the loan to Little Rock-400 for the benefit of Taconic.

73.     As a result of the joint actions of Somera and Taconic in misappropriating the confidential information, Taconic was able to acquire the loan at a discount and put itself in a position to enrich itself at the expense of the Borrowers.  Through their conduct, Somera and Taconic destroyed Borrowers ability to finalize a settlement of the loan with Wells Fargo on

favorable terms and caused Borrowers to incur extensive expenses in connection with the loan including without limitation substantial legal costs and attorney's fees.

74.     Because the refinancing option was lost at the time of the actions of Wells Fargo and the servicers, as described above, and due to the sale of the Mortgage to Little Rock-400, the Plaintiffs have been damaged accordingly.  Plaintiffs have complied with all conditions precedent to this action or such conditions have been waived or have otherwise occurred.

**COUNT I - BREACH OF CONTRACT**
**WELLS FARGO**

75.     Plaintiffs re-allege and incorporate herein paragraphs 1 through 74 above.

76.     Wells Fargo had a duty under the Loan Documents to cooperate with Plaintiffs in the performance of their obligations thereunder and to not hinder, delay or impede Plaintiffs in the performance of their obligations.

77.     Wells Fargo also had a duty under the Loan Documents to deal fairly with Plaintiffs and in good faith in all aspects of the loan relationship.

78.      The duties of Wells Fargo included without limitation the duty not to hinder Plaintiffs' ability to pay off the loan or refinance the loan, the duty to promptly provide an accurate payoff statement and the duty not to impede Plaintiffs in their efforts to secure leases for the Property.

79.     Wells Fargo repeatedly breached its duties under the Loan Documents by knowingly and intentionally thwarting Plaintiffs in their efforts to pay off and refinance the loan, refusing to timely provide a payoff statement for the loan despite receiving multiple requests and despite having the ability to provide a payoff statement upon request, providing an inaccurate payoff statement for the loan containing an illegal late charge of $1,200.000.00, and knowingly and intentionally causing the Mitchell Williams lease to be terminated.

80.     Even though some of the delay in the refinancing process was caused by Wells Fargo and Berkadia, borrowers were ready, willing and able to pay the reasonable default interest and associated legal fees caused by the delayed closing on the refinancing in the initial 30 days after maturity of the note. Wells Fargo was aware of the time pressures associated with the new loan necessary to pay its note, as well as the time pressures associated with the new law firm tenant. Borrowers obtained extensions of time to account for the 30 days beyond maturity, and Wells Fargo's' acts as described above caused the resulting damages of bankruptcy filing and loss of the tenant.

81.     As a direct and proximate result of these intentional breaches, Plaintiffs have suffered damages, including without limitation, the termination of the Mitchell Williams lease, the loss of millions of dollars in the value of the Property, lost profits, loss of refinancing opportunities, the loss of funds expended in the effort to refinance the loan and related matters, increased legal fees and expenses, lost opportunity costs and costs of delay.

Wherefore Plaintiffs demand judgment against Defendants, Wells Fargo, for damages, interest, attorney's fees, court costs and for such further legal and equitable relief as the Court deems just and proper.

## COUNT II – NEGLIGENCE
## WELLS FARGO, LNR AND BERKADIA

82.     Plaintiffs re-allege and incorporate herein paragraphs 1 through 74 above.

83.     Wells Fargo, Berkadia and LNR each owed Plaintiffs a duty of reasonable care in connection with the loan and the Borrowers' efforts to secure leases for the Property and to pay off the loan.

84.     Wells Fargo, Berkadia and LNR repeatedly breached their respective duties of reasonable care to Plaintiffs by unreasonably thwarting Plaintiffs in their effort to pay off and

refinance the loan, unreasonably refusing to provide a timely payoff statement for the loan despite receiving multiple requests and despite having the ability to provide a payoff statement upon request, unreasonably providing an inaccurate payoff statement for the loan containing an illegal late charge of $1,200.000.00 and unreasonably causing the Mitchell Williams lease to be terminated.

85.     Even though some of the delay in the refinancing process was caused by Wells Fargo and Berkadia, borrowers were ready, willing and able to pay the reasonable default interest and associated legal fees caused by the delayed closing on the refinancing in the initial 30 days after maturity of the note. Wells Fargo was aware of the time pressures associated with the new loan necessary to pay its note, as well as the time pressures associated with the new law firm tenant. Borrowers obtained extensions of time to account for the 30 days beyond maturity, and Wells Fargo's' acts as described above caused the resulting damages of bankruptcy filing and loss of the tenant.

86.     As a direct and proximate result of these breaches, Plaintiffs have suffered damages, including without limitation, the termination of the Mitchell Williams lease, the loss of millions of dollars in the value of the Property, lost profits, the loss of funds expended in the effort to refinance the loan and related matters, increased legal fees and expenses, lost opportunity costs and costs of delay.

Wherefore Plaintiffs demand judgment against Defendants, Wells Fargo, LNR and Berkadia, for damages, interest, attorney's fees, court costs and for such further legal and equitable relief as the Court deems just and proper.

## COUNT III - TORTIOUS INTERFERENCE
## WELLS FARGO, LNR AND BERKADIA

87.     Plaintiffs re-allege and incorporate herein paragraphs 1 through 74 above.

88.     Wells Fargo, Berkadia and LNR had actual knowledge of the advantageous contractual relationship and business expectancy between Plaintiffs and Mitchell Williams in connection with the Mitchell Williams lease.

89.     Wells Fargo, Berkadia and LNR, acting in concert, knowingly and intentionally interfered with such contractual relationship and business expectancy by refusing to provide a timely payoff statement for the loan despite receiving multiple requests and despite having the ability to provide a payoff statement upon request, by providing an inaccurate payoff statement for the loan containing an illegal late charge of $1,200.000.00 and by thwarting Plaintiffs' efforts to refinance the loan.

90.     Wells Faro, Berkadia and LNR knew and intended that these acts of interference would directly result in the termination of the Plaintiffs' contractual relationship and business expectancy with Mitchell Williams.

91.     Even though some of the delay in the refinancing process was caused by Wells Fargo and Berkadia, borrowers were ready, willing and able to pay the reasonable default interest and associated legal fees caused by the delayed closing on the refinancing in the initial 30 days after maturity of the note. Wells Fargo was aware of the time pressures associated with the new loan necessary to pay its note, as well as the time pressures associated with the new law firm tenant. Borrowers obtained extensions of time to account for the 30 days beyond maturity, and Wells Fargo's' acts as described above caused the resulting damages of bankruptcy filing and loss of the tenant.

92.     These acts of interference were improper, unlawful and unjustified.

93.     As a direct and proximate result of these acts of interference, Plaintiffs have suffered damages, including without limitation, the termination of the Mitchell Williams

contractual relationship and business expectancy, the loss of millions of dollars in the value of the Property, lost profits, the loss of funds expended in the effort to refinance the loan and related matters, increased legal fees and expenses, lost opportunity costs and costs of delay.

Wherefore Plaintiffs demand judgment against Defendants, Wells Fargo, Berkadia and LNR, for damages, interest, attorney's fees, court costs and for such further legal and equitable relief as the Court deems just and proper.

### COUNT IV - AIDING AND ABETTING TORTIOUS INTERFERENCE BERKADIA AND LNR

94.     Plaintiffs re-allege and incorporate paragraphs 1 through 74 above.

95.     Wells Fargo, Berkadia and LNR had actual knowledge of the advantageous contractual relationship and business expectancy between Plaintiffs and Mitchell Williams in connection with the Mitchell Williams lease.

96.      Berkadia and LNR actively participated and substantially assisted Wells Fargo in interfering with such contractual relationship and business expectancy by refusing to provide a timely payoff for the loan statement despite having the ability to do so upon request, by providing an inaccurate payoff statement for the loan containing an impermissible illegal late charge of $1,200.000.00 and by thwarting Plaintiffs' efforts to refinance the loan.

97.     Even though some of the delay in the refinancing process was caused by Wells Fargo and Berkadia, borrowers were ready, willing and able to pay the reasonable default interest and associated legal fees caused by the delayed closing on the refinancing in the initial 30 days after maturity of the note. Berkadia and LNR were aware of the time pressures associated with the new loan necessary to pay its note, as well as the time pressures associated with the new law firm tenant. Borrowers obtained extensions of time to account for the 30 days beyond maturity, and

Berkadia and LNR's acts as described above caused the resulting damages of bankruptcy filing and loss of the tenant.

98.     Berkadia and LNR knew and intended that these acts of interference would directly result in the termination of Plaintiffs' contractual relationship and business expectancy with Mitchell Williams.

99.     These acts of interference were improper, unlawful and unjustified.

100.    As a direct and proximate result of the interference, Plaintiffs have suffered damages, including without limitation, the termination of the Mitchell Williams contractual relationship and business expectancy, the loss of millions of dollars in the value of the Property, lost profits, expenses incurred to refinance the loan and related matters, increased legal fees and expenses, lost opportunity costs and costs of delay.

Wherefore Plaintiffs demand judgment against Defendants, Berkadia and LNR, for damages, interest, attorney's fees, court costs and for such further legal and equitable relief as the Court deems just and proper.

## COUNT V - DECLARATORY RELIEF
## LITTLE ROCK-400

101.    Plaintiffs re-allege and incorporate paragraphs 1 through 74 above.

102.    A bona fide dispute has arisen between Plaintiffs and Little Rock-400 regarding the $1,200,000.00 late charge that the lender attempted to add to the loan while Plaintiffs were engaged in a refinancing of the loan.

103.     Plaintiffs contend the late charge is contractually impermissible and illegal.

104.    An actual controversy exists between Plaintiffs and Little Rock-400 regarding the late charge and the true balance due under the loan.

105.    The controversy is substantial and concrete and touches the legal relations of parties with adverse interests and is subject to specific relief through a decree of conclusive character.

106.    Plaintiffs seek declaratory relief pursuant to 28 U.S.C. §§ 2201-2202 and all supplement relief that is available.

Wherefore Plaintiffs demand judgment against, Defendant, Little Rock-400, declaring that the late charge is impermissible and illegal, determining the true balance of the loan and granting such further relief legal and equitable relief as the Court deems just and proper.

### COUNT VI – BREACH OF MASTER CONFIDENTIALITY AGREEMENT
### SOMERA

107.    Plaintiffs re-allege and incorporate paragraphs 1 through 74 above.

108.    Pursuant to the terms of the Master Confidentiality Agreement, Somera agreed to hold any information provided to them by Plaintiffs in confidence and to use that information "exclusively for the purpose of evaluating the Proposed Transaction and shall not use the Confidential Information (a) for its own benefit, (b) for the benefit of any third party, or (c) to Provider's detriment."

109.    Somera breached the Master Confidentiality Agreement by disclosing some or all of the confidential information to third parties, including without limitation Taconic and Little Rock-400, without the prior written permission of Plaintiffs for the purpose of assisting Taconic with the acquisition of the loan.

110.    Somera breached the Master Confidentiality Agreement by reproducing and disclosing some or all of the confidential information for purposes other than negotiating and evaluating the possibility of entering into a business relationship with Plaintiffs.

111.     Somera breached the Master Confidentiality Agreement by reproducing some or all of the confidential information without the prior written permission of Plaintiffs.

112.     Somera breached the Master Confidentiality Agreement by using some or all of the confidential information for purposes of circumventing a business relationship with Plaintiffs while taking the business opportunities identified in the confidential information for themselves to the exclusion of Plaintiffs.

113.     As a result of these breaches of the Master Confidentiality Agreement by Somera, Plaintiffs have suffered damages including but not limited to increased legal fees and expenses, lost opportunity costs, lost profits and costs of delay.

114.     Pursuant to the terms of the Master Confidentiality Agreement, Plaintiffs are entitled to their reasonable attorneys' fees in connection with bringing this action.

115.     Plaintiffs have agreed to pay their attorneys a reasonable legal fee in connection with the institution and prosecution of this action.

Wherefore, Plaintiffs demand judgment against Defendant, Somera, for damages, interest, attorney's fees and court costs and for such further legal and equitable relief as the Court deems just and proper.

## COUNT VII – UNJUST ENRICHMENT
## TACONIC AND LITTLE ROCK-400

116.     Plaintiffs re-allege and incorporate paragraphs 1 through 74 above.

117.     Taconic and Little Rock-400 were enriched was at Plaintiffs' expense, and the circumstances are such that equity and good conscience require Taconic and Little Rock-400 to make restitution.

Wherefore, Plaintiffs demand judgment against Defendants, Taconic and Little Rock-400, jointly and severally, for restitution, disgorgement of all benefits unjustly obtained, damages,

interest, attorney's fees and court costs and for such further legal and equitable relief as the Court deems just and proper.

## COUNT VIII – BREACH OF MASTER CONFIDENTIALITY AGREEMENT
## TACONIC

118.    Plaintiffs re-allege and incorporate paragraphs 1 through 74 above.

119.    This count is pled in the alternative.

120.    Somera entered into the Master Confidentiality Agreement as a fully authorized agent of its undisclosed principal, Taconic, and the acts of Somera in connection with the agreement are therefore deemed to be the Acts of Taconic.

121.    Taconic was fully bound by the terms of the Master Confidentiality and is jointly and liable with Somera for breaches of same.

122.    As a result of these breaches of the Master Confidentiality Agreement, Plaintiffs have suffered damages, including but not limited to increased legal fees and expenses, lost opportunity costs, lost profits and costs of delay.

123.    Pursuant to the terms of the Master Confidentiality Agreement, Plaintiffs are entitled to their reasonable attorneys' fees in connection with bringing this action.

124.    Plaintiffs have agreed to pay their attorneys a reasonable legal fee in connection with the institution and prosecution of this action.

Wherefore, Plaintiffs demand judgment against Defendant, Taconic, for damages, interest, attorney's fees and court costs and for such further legal and equitable relief as the Court deems just and proper.

## COUNT IX – BREACH OF CONTRACT
## LITTLE ROCK-400

125.    Plaintiffs re-allege and incorporate paragraphs 1 through 74 above.

126.    Little Rock-400 had a duty under the Loan Documents to cooperate with Plaintiffs in the performance of their obligations thereunder and to not hinder, delay or impede Plaintiffs in the performance of their obligations.

127.    Little Rock-400 also had a duty under the Loan Documents to deal fairly with Plaintiffs and in good faith in all aspects of the loan relationship.

128.     The duties of Little Rock-400 included without limitation the duty not to hinder Plaintiffs' ability to pay off the loan or refinance the loan and to not interfere with Plaintiffs' tenant relationships.

129.    Little Rock-400, through its agents,  breached its duties under the Loan Documents by knowingly and intentionally interfering with Plaintiffs' tenant relationships and by informing at least one existing tenant, which had expressed interest in extending their lease term, that the lender would not be advancing any funds to support any tenant improvements at the building, that the building was going to be foreclosed upon and that the building would suffer a rapid decay during the extended foreclosure process

130.    As a direct and proximate result of these intentional breaches, Plaintiffs have suffered damages.

Wherefore Plaintiffs demand judgment against Defendant, Little Rock-400, for damages, interest, attorney's fees, court costs and for such further legal and equitable relief as the Court deems just and proper.

## COUNT X – TORTIOUS INTERFERENCE
## LITTLE ROCK-400, TACONIC AND SOMERA

131.    Plaintiffs re-allege and incorporate paragraphs 1 through 74 above.

132.    Little Rock-400, Taconic and Somera had actual knowledge of the advantageous contractual relationship and business expectancy between Plaintiffs and their tenants.

133.    Little Rock-400, Taconic and Somera, acting in concert, knowingly and intentionally interfered with such contractual relationships and business expectancy by informing at least one existing tenant, which had expressed interest in extending their lease term, that the lender would not be advancing any funds to support any tenant improvements at the building, that the building was going to be foreclosed upon and that the building would suffer a rapid decay during the extended foreclosure process

134.    Little Rock-400, Taconic and Somera, knew and intended that these acts of interference would directly result in harm to Plaintiffs' contractual relationships and business expectancy with the tenants and or put pressure on the Plaintiffs to pay off the loan in full and to waive some or all of the damages as in Counts I-IX above.

135.    These acts of interference were improper, unlawful and unjustified.

136.    As a direct and proximate result of these acts of interference, Plaintiffs have suffered damages.

Wherefore Plaintiffs demand judgment against Defendants, Little Rock-400, Taconic and Somera, for damages, interest, attorney's fees, court costs and for such further legal and equitable relief as the Court deems just and proper.

Dated: April 13, 2018
    Wilmington, Delaware          WHITEFORD, TAYLOR & PRESTON LLC

By:    /s/ *Thomas J. Francella, Jr.*
       Thomas J. Francella, Jr., Esq. (#3835)
       The Renaissance Centre
       405 King Street, Suite 500
       Wilmington, DE 19801
       Telephone: (302) 357-3252
       Facsimile: (302) 357-3272
       Email: tfrancella@wtplaw.com

       *Counsel to the Debtors and Debtors in Possession*

-and-

RUBIN & RUBIN
*/s/ Guy B. Rubin*
Guy B. Rubin, Esq. (FL No. 691305)
Rubin & Rubin
111 SE Osceola St., Suite 200
Stuart, FL 34994
Telephone: (772) 283-2004
Facsimile: (772) 283-2009
Email:  grubin@rubinandrubin.com

*Counsel for Plaintiff – Admitted Pro Hac Vice*
*400 CAPITOL CENTER*