**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NNN 400 CAPITOL CENTER 16, LLC, *et al.*, | ) | Case No. 16-12728(KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| NNN 400 CAPITOL CENTER, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No.  18-50384(KG) |
| | ) | |
| WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF COMM 2006-C8 COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES; LNR PARTNERS, LLC, a Florida Limited Liability Company; BERKADIA COMMERCIAL MORTGAGE, LLC, a Delaware Limited Liability Corporation; LITTLE ROCK-400 WEST CAPITOL TRUST, a Delaware Statutory Trust; SOMERA ROAD, INC., a New York Corporation; and TACONIC CAPITAL ADVISORS, LP, a Delaware Limited Partnership. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | **Re D.I. Nos. 32 & 34** |

**<u>MEMORANDUM OPINION</u>**

The plaintiffs, NNN 400 Capitol Center 16, LLC, and affiliated companies ("Plaintiffs") have brought an adversary proceeding against defendants, Wells Fargo Bank, N.A., as Trustee for the Registered Holders of COMM 2006-C8 Commercial Mortgage Pass-Through Certificates ("Wells Fargo"), LNR Partners, LLC ("LNR"), Berkadia Commercial Mortgage, LLC ("Berkadia"), Little Rock-400 West Capitol Trust

("LR-400") Taconic Capital Advisors ("Taconic") (collectively, "Defendants"), and Somera Road, Inc. ("Somera"). The proceeding against the Defendants is largely a lender liability set of claims against which Defendants have moved to dismiss. The Plaintiffs' Amended Complaint, accepting the well pleaded facts to be true,[1] states a strong case for lender liability. Proof of the alleged facts in the course of the case remains for Plaintiffs to provide. The stated facts follow.

## JURISDICTION AND VENUE

The Court has jurisdiction over the adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and Rule 7001 of the Federal Rules of Bankruptcy Procedure. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTS

The underlying property (the "Property") at issue is a 547,000 square foot office building. Am. Cmplt., ¶ 6. It is a commercial building known as "Regions Center" located in Little Rock, Arkansas. *Id.* The Property is owned by thirty-two separate investors who hold title as tenants in common, *id.*, ¶¶ 7, each of which has filed for bankruptcy in the Court. *Id.*, ¶ 10. The Property is encumbered by a mortgage, assignment of leases and rents, security agreement and fixture filing from August 2006 (collectively, the "Mortgage" or the "Loan Documents"). *Id.*, ¶ 9.

---

[1] *See, e.g.*, *Ashcroft v. Iqbal*, 556, U.S. 662, 678 (2009) (stating, "for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true," but not legal conclusions).

Bank of America, N.A., was the original lender. It assigned the Mortgage to LaSalle Bank, N.A., which then assigned the Mortgage to Wells Fargo, effective January 2, 2008. *Id.*, ¶¶ 27-28. Berkadia serviced the loan (*id.*, ¶ 29), and LNR served as "special servicer." *Id.*, ¶ 32. Wells Fargo assigned the Mortgage to LR-400 during the pending adversary proceeding. *Id.* ¶ 1. LR-400 remains the lender, effective June 13, 2017. *Id.*, ¶ 11. Somera Road, Inc. ("Somera") approached Plaintiffs in December 2016 to solicit Plaintiffs' business. *Id.*, ¶ 67. Somera discussed Plaintiffs and their business with Plaintiffs' lawyers, Rubin & Rubin P.A. ("Rubin"). *Id.* The idea was for Somera to find a party to acquire the Mortgage. *Id.* Plaintiffs (through Rubin) and Somera entered into a Master Confidentiality Agreement in which they agreed to keep all information about the Mortgage and the Property confidential. *Id.*, ¶ 68. The Master Confidentiality Agreement prohibited Somers from using confidential information for its benefit, for a third party's benefit or to the Plaintiffs' detriment. *Id.*, ¶ 70.

Instead of maintaining confidentiality, Somers took the confidential information to negotiate and obtain a sale of the Mortgage to LR-400. *Id.*, ¶ 73. The purchaser, LR-400, is a trust owned by Taconic Capital Advisors, L.P. ("Taconic"). *Id.* Somera and Taconic were working in concert, even when Somera entered into the Master Confidentiality Agreement. *Id.*, ¶ 74. Together, Somera and Taconic "stole" the confidential information about the Mortgage and brought about the assignment of the Mortgage to Taconic, which damaged Plaintiffs.

## STANDARD OF REVIEW

The Standard of Review is a critical but often overlooked component of the decision on a motion. It is particularly important in the present case.

For purposes of reviewing a motion to dismiss under Rule 12(b)(6), the Court accepts as true "all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant." *Foglia v. Renal Ventures Mgmt.*, LLC, 754 F. 3d 153, 154 n. 1 (3d Cir. 2014). The Court will, however, disregard legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements. *Santiago v. Warminster Twp.*, 629 F. 3d 121, 128 (3d Cir. 2010). The Court considers only the complaint and exhibits attached to the complaint. *Mayer v. Belichick*, 605 F. 3d 223, 230 (3d Cir. 2010). Dismissal is required if a complaint fails to state a claim upon which relief can be granted. Rule 12(b)(6) is associated with Federal Rule of Civil Procedure 8(a)(2), made applicable by Bankruptcy Rule 7008, which states that a complaint fails unless it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court observed that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 285 (1986)). The *Twombly* standard is one of plausibility and not probability "[and] simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the necessary

element. *Id.* at 556. In analyzing a complaint, the court will determine if a plaintiff has "nudged [their] claims across the line from conceivable to plausible." *Id.* at 570.

The Supreme Court further addressed the Rule 8(a)(2) pleading standard in its *Iqbal* decision. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–79 (2009). Under *Iqbal*, the Supreme Court affirmed that the *Twombly* standard applies to all civil suits in federal courts and further identified that "a court must accept as true all of the allegations contained in the complaint," and "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 678. The Third Circuit in applying the *Iqbal* standard stated a two-part test:

> First, the factual and legal elements of a claim should be separated. The [court] must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a [court] must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief.

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d. Cir. 2009).

## **DISCUSSION**

When the Court first read and reread the six briefs which the parties submitted on the motions to dismiss, the Court thought its opinion would be lengthy and complex. The parties make many arguments back and forth and addressing all of them would necessitate a lengthy opinion requiring considerable time to write. However, by focusing on the Amended Complaint, it becomes immediately apparent that the effort required to decide the motions to dismiss is not nearly as great as it first appeared to be and the Court must and will deny the motions to dismiss.

The Amended Complaint contains allegations, some of which follow. They are assumed to be true in deciding the motions to dismiss. It will be necessary to read them to understand the Court's thinking. The Plaintiffs alleged that:

> 3. The actions of Wells Fargo and its servicers pertinent to Plaintiffs' loan lay in sharp contrast to the industry standard summarized above. Wells Fargo and its servicers eschewed any notion of good faith or fairness and intentionally created multiple impediments to Plaintiffs' performance of its loan obligations with the goal of forcing Plaintiffs into default. For example, as more fully described below, Wells Fargo and its servicers refused to release Plaintiffs' own reserve funds despite its contractual obligation to do so, hindering the ability to timely pay property-related expenses, refused to approve leases that clearly should have been approved, imposing great financial stress on the property and refused to provide a timely and accurate payoff statement, destroying a pending transaction with a new lender to refinance of loan. These actions were taken with the specific intent of imposing a severe financial burden on Plaintiffs and of conjuring up defaults under the loan documents with the specific the intent of using such defaults as a pretext to recover massive penalties from Plaintiffs, to block refinancing opportunities and to rob Plaintiffs of the equity in their property. . . .

* * *

> 31. Berkadia directly and repeatedly impeded Borrowers' performance under the Loan Documents by refusing to provide approvals for new or renewed leases within any time frame that could be considered commercially reasonable.
>
> 32. For example, Asset Manager informed Berkadia of the specific terms for a lease with RGN-Little Rock 1, LLC ("Regus Lease") on May 21, 2015. The lease was approved by the tenant and Asset Manager in mid-September 2015 and sent to Berkadia for approval. On September 30, 2015, Asset Manager received responses from Helene Vishio, Client Services Manager at Berkadia, and separately from the Lease Review Requests Group, each with questions. Asset Manager responded to those questions on October 5, 2015 and on October 7th was advised the issues were being sent to Special Servicer (LNR) for review. To avoid losing a major tenant, Asset Manager executed the Regus Lease after it threatened to walk away due to Wells Fargo's delayed response. The Regus Lease was finally approved by LNR on April 8, 2016.

33. Berkadia also directly and repeatedly impeded Borrowers' performance under the Loan Documents by refusing to provide approvals of requests for the release of reserve account funds for tenant improvements, property repairs, leasing commissions, upkeep and other reserve account disbursements allowed under the Loan Documents within any time frame that could be considered commercially reasonable.

34. For example, on or about November 30, 2015, Asset Manager submitted requests to Berkadia for disbursement from reserve accounts for leasing commissions due pursuant to the Regus Lease. These requests were not approved until 2016. The inability to pay leasing commissions created stress on the property, requiring use of Borrowers' cash flow for purposes for which it was not intended. Borrowers expected to negotiate leases for new tenants beginning in March 2016 for over 9,000 square feet of the Property. Failure to pay the leasing agent promptly created a stigma on the Property in the leasing market and impaired Plaintiffs' ability to market and lease that available space through the loss of that leasing agent.

35. In another instance, Property Manager requested $532,632.54 to be released from lender held reserve accounts for tenant improvements and leasing commissions on April 26, 2016. In response, on April 27 and May 4, 2016, Berkadia requested the application package be resubmitted in a different manner. The package was resubmitted that same day but on May 18, 2016 the request still had not been funded. With its resubmittal, Property Manager informed Berkadia the funds were urgently needed so that the Property's cash flow would not be compromised. On May 20, 2016, Berkadia responded with a request for additional documentation which was provided on May 26th and May 31st. On June 7th Berkadia, finally responded by stating they were releasing only partial funds, in part, because one of the leases pertaining to those funds was still being held for approval by Wells Fargo.

36. As the loan maturity date came closer, Wells Fargo impermissibly stopped agreeing to release any reserve account funds, citing the close proximity to maturity. There was no basis in the Loan Documents for denying release of funds based on proximity to maturity. As a result, Borrowers were forced to use funds from the Property's cash operating account to avoid defaulting on existing Wells Fargo approved leases to avoid potential lawsuits that would arise in the event of such defaults. Wells Fargo now claims this use of funds as an event of default and claims these funds as part of their secured interest in the collateral.

37. Excessive delays such as these were carried out with specific intent of putting a financial stress on the Borrowers' business with the goal of forcing the loan into default. On information and belief, these delays are part of widespread pattern and practice through which many borrowers have been victimized.

38. In early 2014, Borrowers decided to appoint FGG as the Asset Manager in place of a prior asset manager. Multiple Borrowers advised Berkadia of their intent to change asset managers in early 2014. FGG immediately notified Berkadia of this change and requested Wells Fargo's consent to the change. In response, on October 14, 2014, LNR issued a "pre-negotiation letter" to FGG requesting, among other things, (a) financial statements from each Borrower prepared within 30 days of the date of the pre-negotiation letter, (b) three (3) years of certified financial statements from the key principals of the proposed asset manager, (c) federal tax returns for the past three (3) years from the key principals of the proposed asset manager, (d) references and a list of all loans in which the key principals of the proposed asset manager had an interest and (e) consent to credit background checks for the key principals of the proposed asset manager. Plaintiffs and FGG agreed to provide the items requested in items (b) through (e) as to FGG but not as to its key principals as such requests were clearly overreaching and not necessary to approve a new management company.

39. On October 15, 2014, LNR also requested an application/processing fee, third party fee deposit and legal retainer for the Lender's approval process for change of the Asset Manager. Borrowers promptly paid LNR $21,500 on October 24, 2014 for the requested fees and contemporaneously paid $7,500 for the requested legal retainer to Bilzin Sumberg Baena Price & Axelrod LLP (counsel for LNR).

40. On November 18, 2014, Borrowers informed LNR it would accept the terms of the pre-negotiation letter except for the objectionable portion mentioned above. LNR responded the following day, stating the requested revisions would be reviewed internally. The next communication from LNR was April 21, 2015 requesting the signed pre-negotiation letter without any reference to the objectionable portion of the letter. FGG and Plaintiffs responded on May 13th, again asking LNR to review the requested changes to the letter. To date, neither FGG nor Borrowers have ever received any further communications from LNR (nor any of Wells Fargo's representatives) addressing the requested consent to change in the asset manager. In fact, LNR would later claim that it was unaware of any requested consent to such a change.

\* \* \*

45. On June 29, 2016, Berkadia offered to provide Borrowers with a payoff statement for the loan and cited a 30-day notice period requirement of the Loan Documents. There is no such requirement in the Loan Documents. Borrowers responded immediately by requesting a payoff statement effective August 15, 2016. In response, Berkadia sent an estimated payoff statement on July 12th, noting now that the Loan Documents required a 60-day notice period and that a final payoff statement would be provided once the August 1st debt service payment was made.

46. On August 23, 2016, Borrowers requested a final payoff statement, netting out all reserve accounts, effective August 31st. Borrowers specifically advised Berkadia that a closing on the new loan was set for the end of that month. In response, Berkadia raised for the first time an issue regarding a mezzanine loan that was part of the initial loan package with Bank of America, stating the payoff could not be approved without confirmation that mezzanine loan had been paid. The maturity date for that mezzanine loan was November 2006 – well before the Mortgage was assumed by Wells Fargo - and Wells Fargo was well aware that the mezzanine loan had been satisfied prior to Wells Fargo assuming the Mortgage. Upon investigation by Borrowers, it was discovered Bank of America had never properly filed a Satisfaction of the mezzanine loan. Borrowers provided Berkadia with a title insurance commitment, prepared for the refinancing, evidencing the mezzanine loan pay off. Borrowers did not receive any further communication from Berkadia or Wells Fargo in this regard.

\* \* \*

53. Also, on September 28th Borrowers advised Berkadia of a new lease with a major tenant, "Mitchell Williams," a large law firm that would occupy three floors of the building. Borrowers advised Berkadia the lease was set to automatically terminate if the refinancing did not take place on September 30th as scheduled. The lease with Mitchell Williams added more than $5,000,000.00 in value to the property and was a condition of the new loan with Calmwater Capital. Any termination of that lease would cause the new loan to fail. In response, Berkadia again referred Borrowers to LNR.

54. LNR finally reached out to Borrowers on September 28, 2016. Borrowers made yet another request for a payoff statement, making clear it was needed immediately. LNR replied stating it would request a payoff statement but typically rush requests would take 5 business days to process. LNR made this statement despite the fact that default notices had been sent to Borrowers stating the payoff statement would be provided "upon request." The following day, at 4:25 PM, LNR advised Borrowers it would forward a payoff statement as soon as it was available. Borrowers reminded LNR of the imminent termination of the Mitchell Williams lease and that any such termination would kill the refinancing of the loan and that the need for the payoff statement was therefore urgent. With full knowledge of the imminent termination of the Mitchell Williams lease, LNR refrained from sending the payoff statement to Borrowers until 8:08 PM on September 30th – after close of business – at which time it was impossible to close on the new loan as scheduled.

55. The belated payoff statement shockingly contained an illegal "late payment charge" that added over $1.2 Million to the payoff amount. This late charge so increased the loan debt as to make the new loan insufficient to cover the payoff amount, effectively ending the possibility of refinancing with the new lender. Accordingly, the Mitchell Williams lease was terminated shortly thereafter, devaluing the building by over $5,000,000.00. If Borrowers had received a proper payoff statement in time, the closing on the new loan would have gone forward, and Mitchell Williams would have been bound by their lease. Accordingly, Borrowers lost the value the Mitchell Williams lease added to the Property as well as the funds advanced on due diligence and related matters for the new loan.

56. Despite the foregoing, Borrowers continued to pursue refinancing options to pay off the original Mortgage. Borrowers promptly demanded that Wells Fargo remove the impermissible late charge. In response, on October 4, 2016, LNR offered to waive 50% of the late charge and extend the payment deadline to October 7th. Then, on October 6, 2016, LNR offered to lower the late charge to $300,000. After continued discussions, on October 7th Wells Fargo finally issued a new payoff statement completely removing the illegal late charge.

* * *

67. Somera first approached Borrowers on December 15, 2016 to solicit business from Borrowers and later began discussions with Borrowers in March 2017. Somera approached Borrowers, solicited the business of Borrowers and carried out discussions with Borrowers through Borrower's authorized agent, Rubin & Rubin, P.A. ("Rubin"). The purpose of the discussions was for Somera to locate a financially qualified potential partner to acquire the Note from Wells Fargo under terms favorable to Borrowers and in such a manner that a mutual benefit would inure to both Borrowers and Somera.

68. To that end, Plaintiffs and Somera entered into a Master Confidentiality Agreement in which they agreed to keep all information about the Property and the loan confidential. The Master Confidentiality Agreement was executed by Rubin as the authorized agent of Borrowers who were the fully disclosed principals in the transaction. Having approached Rubin to solicit Borrowers' business, Somera was fully aware that Rubin was acting as an agent of Borrowers when it executed the agreement, and that Borrowers were the principals in the transaction. Borrowers are therefore parties to the Master Confidentiality Agreement and are in direct contractual privity with Somera. In the alternative, Borrowers are direct and intended third party beneficiaries of the agreement. A true copy of the Master Confidentiality Agreement is attached as Exhibit F.

69. Plaintiffs have fully and faithfully performed under the Master Confidentiality Agreement.

70. The Master Confidentiality Agreement specifically forbade Somera from using any confidential information "(a) for its own benefit, (b) for the benefit of any third party, or (c) to Provider's detriment." (Master Confidentiality Agreement, Para. 3)

71. Under this Confidentiality Agreement, Somera agreed it would not

> (a) enter into any oral or written agreement or arrangement of any kind for or in connection with a Proposed Transaction, (b) initiate maintain or respond to any contact with the owner of the underlying property or any note secured thereby the underlying property relating to the Proposed Transaction, any obligor or borrower related to the Proposed Transaction, or any of the respective employees or representatives of the foregoing (except in the ordinary course of business unrelated to the Proposed Transaction), or (c)

otherwise circumvent or undermine the Provider's opportunity with respect to the Proposed Transaction.

(Master Confidentiality Agreement, Para. 8)

72. Pursuant to the Agreement, Borrowers delivered to Somera on March 10, 2017 a Schedule which specifically listed the loan with Wells Fargo as a Proposed Transaction and made the loan and loan- related information subject to confidentiality under the Master Confidentiality Agreement. This Schedule was executed by a duly authorized representative of Somera. A true copy of the Schedule is attached hereto as Exhibit G.

73. In blatant violation of the Master Confidentiality Agreement, Somera used the confidential information it obtained from Borrowers to negotiate and procure a sale of the loan to Little Rock-400, a trust ultimately owned by Taconic, in June 2017. An Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing was then recorded in the Pulaski County, Arkansas official records on June 14, 2017, in furtherance of the transaction.

74. Subsequent to these events, Borrowers discovered that Somera was secretly working in concert with Taconic when it entered into the Master Confidentiality Agreement, and that together Somera and Taconic stole the confidential information regarding the loan and brought about the assignment of the loan to Little Rock-400 for the benefit of Taconic.

75. As a result of the joint actions of Somera and Taconic in misappropriating the confidential information, Taconic was able to acquire the loan at a discount and put itself in a position to enrich itself at the expense of the Borrowers. Through their conduct, Somera and Taconic destroyed Borrowers' ability to finalize a settlement of the loan with Wells Fargo on favorable terms and caused Borrowers to incur extensive expenses in connection with the loan including without limitation substantial legal costs and attorney's fees.

76. Because the refinancing option was lost at the time of the actions of Wells Fargo and the servicers, as described above, and due to the sale of the Mortgage to Little Rock-400, the Plaintiffs have been damaged accordingly. Plaintiffs have complied with all conditions precedent to this action or such conditions have been waived or have otherwise occurred.

The Court quoted the Amended Complaint at length because the facts alleged in great detail make the case for why at this early stage the Court will not dismiss the Amended Complaint. The Amended Complaint contains other factual allegations which the Court has not quoted. Nonetheless, the allegations contribute to denying the motions to dismiss.

Defendants' Motion to Dismiss

The Defendants argue in support of their motion to dismiss that the Loan Documents contain a contractual waiver which is enforceable under controlling Arkansas law. Section 18.6 of the Loan Documents provides, in part, that:

> Section 18.6. Remedies of Borrower. In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed . . . Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment . . . .

The Defendants point to cases which enforce the waiver. *See Finagin v. Ark. Dev. Fin. Auth.*, 355 Ark. 440 (2003); *Nat'l Union Fire Ins. Co. of Pittsburgh Pa. v. Guardtronic, Inc.*, 76 Ark. App. 313 (2002). The defendants also argue that Plaintiffs did not plead essential elements of (1) the breach of contract claim (Count I); (2) the negligence claim against Wells Fargo (Count II); (3) the tortious interference claim against LR-400, LNR and Berkadia (Count III); (4) the aiding and abetting claim against LNR and Berkadia (Count IV); (5) the declaratory judgment claim against LR-400 (Count V); (6) the unjust enrichment claim against Taconic and LR-400 (Count VII); (7) the breach of contract claim against LR-400 (Count IX); (8) the tortious interference claim against LR-400 and Taconic

(Count X); and (9) the Confidentiality Agreement claim against Taconic (Count VIII).

The Court is fully satisfied, however, that Plaintiffs' claims are not for unreasonable conduct but for intentional action on the part of the Defendants. Reading the Complaint and the allegations, some of which are quoted above, is convincing that intentional conduct is at the heart of the Amended Complaint. The exculpatory clause obviating liability for unreasonable actions does not address breach of contract, intentional torts or other intentional conduct. Section 18.6 does not release Defendants from liability for the conduct which Plaintiffs allege in the Amended Complaint. The Plaintiffs further allege that they suffered damages from Defendants' purposeful actions.

The Court finds it unnecessary to address all of Defendants' arguments in support of their motion to dismiss. The allegations in the Amended Complaint are detailed and state claims. Plaintiffs will at some point have to prove their allegations by a preponderance of the evidence. Whether the facts alleged will lead to Plaintiffs' recovery is far from resolved on the occasion of the motion to dismiss.

## Somera's Motion to Dismiss

Somera's motion to dismiss is premised on the fact that Plaintiffs are not parties to the Master Confidentiality Agreement.[2] The party which signed the Master Confidentiality Agreement was Plaintiff's law firm, Rubin. In the Amended Complaint the Plaintiffs state unequivocally that (1) Somera approached Plaintiffs to solicit their business, (2) Somera was forbidden from using any confidential information regarding

---

[2] Taconic argued in its motion to dismiss that it also was not a party to the Master Confidentiality Agreement. The Court rejects that argument at this early stage of the proceedings.

Wells Fargo, (3) used the confidential information to procure the sale of the loan to LR-400, which was owned by Taconic, (4) Plaintiffs were damaged and (5) Somera was fully aware that Rubin was acting as agent for Plaintiffs.

Somera raises as its principal argument that Plaintiffs are attempting to assert rights as a third-party beneficiary but have failed to plead the necessary elements of the existence of a valid and binding contract, that the contract was intended for its benefit and that the benefit is sufficiently immediate rather than incidental.

However, it is clear from the Amended Complaint that Plaintiffs have made the necessary allegations. Plaintiffs clearly allege that a contract existed, they adequately performed, Somera breached and Plaintiffs were damaged. The facts Plaintiffs allege are adequate and they plausibly state a valid claim.

## CONCLUSION

The Court will deny the motions to dismiss.

Dated: October 4, 2018

_____
KEVIN GROSS, U.S.B.J.