## IN IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NNN 400 CAPITOL CENTER 16, LLC, *et al.*, | Case No. 16-12728 (JTD) (Jointly Administered) |
| Debtors. | |
| NNN 400 CAPITOL CENTER, LLC, *et al.*, | Adv. No. 18-50384-JTD |
| Plaintiffs, | |
| v. | |
| WELLS FARGO BANK, N.A., *et al.*, | |
| Defendants. | |

## LENDER DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A DIRECTED JUDGMENT AND FOR A RULE TO SHOW CAUSE

# TABLE OF CONTENTS

**Page**

I.    SUMMARY OF THE STAGE OF PROCEEDINGS ........................................................1

II.   SUMMARY OF THE RELIEF SOUGHT AND THE BASES FOR THE SAME............2

III.  THE COURT SHOULD GRANT A DIRECTED JUDGMENT IN LENDER
      DEFENDANTS' FAVOR AS TO COUNTS I, II, III, IV, V, VII, VIII, AND IX.............3

      A.    Plaintiffs Failed To Prove That Lender Defendants Caused The Alleged
            Harms On Which The Loan Claims Are Based (Counts I-IV, VII, And
            IX). ........................................................................................................................ 4

      B.    Plaintiffs Failed To Prove That The Alleged Prior Events Are Relevant,
            And Even If They Are, They Are Partially Time-Barred. ...................................... 7

      C.    Plaintiffs Failed To Prove The Other Essential Elements Of Their Loan
            Claims (Counts I-IV, VII, And IX)...................................................................... 10

            1.    Plaintiffs Failed To Prove That Prior Lender Breached Any Contract
                  (Count I For Breach Of Contract Against Prior Lender). ......................... 10

            2.    Plaintiffs Failed To Prove That Any Lender Defendant Owed Or Breached
                  A Tort Duty (Count II For Negligence Against Prior Lender, Berkadia,
                  And LNR). ............................................................................................... 11

            3.    Interfered With Any Recognizable Business Expectancy (Count III For
                  Tortious Interference Against Prior Lender, Berkadia, And LNR). ......... 12

            4.    Plaintiffs Failed To Prove That Berkadia Or LNR Aided And Abetted Any
                  Alleged Tort (Count IV For Aiding And Abetting Against Berkadia And
                  LNR). ...................................................................................................... 14

            5.    Plaintiffs Failed To Prove The Essential Elements Of Their Unjust
                  Enrichment Claim (Count VII For Unjust Enrichment Against Taconic
                  and Secured Lender). .............................................................................. 15

            6.    Plaintiffs Failed To Prove That Secured Lender Breached Any Contract
                  (Count IX For Breach Of Contract Against Secured Lender). ................. 16

            7.    A Directed Judgment Is Proper On The Loan Claims For The Additional
                  Reason That They Are Barred By The Loan Documents' Enforceable
                  Liability Limitation................................................................................. 17

      D.    Plaintiffs Failed To Prove Their Declaratory Judgment Claim Against
            Secured Lender (Count V). .................................................................................. 18

i

E.      Plaintiffs Failed To Prove That Taconic Is A Party To The Master Confidentiality Agreement Or That Plaintiffs Were Harmed By Any Alleged Breach Of That Agreement (Count VIII). ................................................. 19

         1.      Taconic Is Not A Party To The MCA And Plaintiffs Failed To Prove Otherwise. ................................................................................................ 20

         2.      Plaintiffs Failed To Prove That The Note Sale Harmed Them. ................ 22

F.      Lender Defendants Are Entitled To Reasonable Attorneys' Fees And Costs Incurred In Defending Against This Adversary Proceeding. ...................... 24

IV.     THE COURT SHOULD ENTER AN ORDER FOR A RULE TO SHOW CAUSE ................................................................................................................. 24

V.      CONCLUSION .......................................................................................................... 28

## TABLE OF AUTHORITIES

**Federal Cases**

*A&A Enters., Inc. v. Great Am. Ins. Co.*, 978 F. Supp. 1229 (E.D. Ark. 1997) .............................4

*Air Prods. & Chems., Inc. v. Wiesemann*, 237 F. Supp. 3d 192 (D. Del. 2017)............................15

*In re Am. Remanufacturers, Inc.*, 453 B.R. 235 (Bankr. D. Del. 2011) ........................................25

*EBC, Inc.*, 618 F.3d at 273), *aff'd*, 786 F. App'x 353 (3d Cir. 2019)............................................4

*Fagal v. Marywood Univ.*, No. 3:14-CV-02404, 2018 WL 1993790 (M.D. Pa. Apr. 27, 2018)...........................................................................................................................4

*In re HH Liquidation, LLC*, 590 B.R. 211 (Bankr. D. Del. 2018)................................................15

*Iannuzzi v. Am. Mortg. Network, Inc.*, 727 F. Supp. 2d 125 (E.D.N.Y. 2010) .............................21

*In re Integrated Health Servs., Inc.*, 307 B.R. 794 (Bankr. D. Del. 2004) ...................................15

*In re Kalisch*, 413 B.R. 115 (Bankr. S.D.N.Y. 2008), *aff'd*, No. 09 Civ. 1636 (PKC), 2009 WL 2900247 (S.D.N.Y. Sept. 9, 2009) ................................................................22

*Laugh Factory, Inc. v. Basciano*, 608 F. Supp. 2d 549 (S.D.N.Y. 2009).....................................21

*LNV Corp. v. Becton*, No. 3:11-cv-00062-BRW, 2012 U.S. Dist. LEXIS 43324 (E.D. Ark. Mar. 29, 2012)..............................................................................................18

*In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d 56 (S.D.N.Y. 2009), *aff'd*, 502 F. App'x 66 (2d Cir. 2012) ..........................................................................................20

*Pa. Emp. Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458 (D. Del. 2010) .....................4, 16

*In re Patchell*, 569 B.R. 635 (Bankr. D. Md. 2017) .................................................................3-4

*Pighee v. L'Oreal USA [Prods.], Inc.*, 351 F. Supp. 2d 885 (E.D. Ark. 2005)............................13

*Ramthun v. Bryan Career College-Inc.*, 93 F. Supp. 3d 1011 (W.D. Ark. 2015) ..................10, 17

*In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90 (3d Cir. 2008); 444 B.R. 286 (Bankr. D.N.J. 2011).................................................................................................25

*In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300 (S.D.N.Y. 2019)...............................20

*U.S. Bank Nat'l Ass'n v. Gunn*, No. 11-cv-01155-RGA, 2015 WL 4641611 (D. Del. Aug. 5, 2015)...............................................................................................................16

*In re W.J. Bradley Mortg. Capital, LLC*, 598 B.R. 150 (Bankr. D. Del. 2019)............................16

**State Cases**

*Adams' Adm'rs v. Huffington's Adm'rs*, 2 Del. Cas. 656, 1821 WL 1020 (Del. 1821) ................................................................................................................17

*Alley v. Rodgers*, 599 S.W.2d 739 (Ark. 1980) ............................................20

*Ark. Research Med. Testing, LLC v. Osborne*, 2011 Ark. 158, 2011 WL 1423993 (2011) ..........................................................................................................11

*Arloe Designs, LLC v. Ark. Capital Corp.*, 431 S.W.3d 277 (Ark. 2014) ................................4, 12

*Balheimer v. Reichhardt*, 55 How. Pr. 414, 1878 WL 11302 (N.Y. Sup. Ct. 1878) ....................22

*Baptist Health v. Murphy*, 373 S.W.3d 269 (Ark. 2010) ............................14

*Coffelt v. Ark. Power & Light Co.*, 451 S.W.2d 881 (Ark. 1970)..................19

*Cornell Glasgow, LLC v. La Grange Props., LLC*, No. N11C-05-016 JRS CLLD, 2012 WL 2106945, at *11 (Del. Super. Ct. June 6, 2012).........................15

*Cross v. W. Waste Indus.*, 469 S.W.3d 820 (Ark. Ct. App. 2015)................11

*Deck House, Inc. v. Link*, 249 S.W.3d 817 (Ark. Ct. App. 2007).................12

*Finagin v. Ark. Dev. Fin. Auth.*, 139 S.W.3d 797 (Ark. 2003) ....................18

*Gordon v. Dino De Laurentiis Corp.*, 529 N.Y.S.2d 777 (N.Y. App. Div. 1988)........................22

*Hayes v. First Nat'l Bank of Memphis*, 507 S.W.2d 701 (Ark. 1974).................................*Passim*

*Hinton v. Bryant*, 367 S.W.2d 442 (Ark. 1963) ..........................................14

*JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 893 N.Y.S.2d 237 (N.Y. App. Div. 2010), The MCA..............................................................................................20

*Mans v. Peoples Bank of Imboden*, 10 S.W.3d 885 (Ark. 2000) .................12

*Mercy Health Sys. Of Nw. Ark., Inc. v. Bicak*, 383 S.W.3d 869 (Ark. App. 2011) .....................12

*MetLife Capital Fin. Corp. v. Wash. Ave. Assocs. L.P.*, 732 A.2d 493 (N.J. 1999) .....................19

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Guardtronic, Inc.*, 64 S.W.3d 779 (Ark. Ct. App. 2002)..............................................................................................18

*Navorro-Monzo v. Hughes*, 763 S.W.2d 635 (Ark. 1989) .........................14

*Ne. Gen. Corp. v. Wellington Advert., Inc.*, 604 N.Y.S.2d 1 (N.Y. 1993)....................22

*Palmer v. Ark. Council on Econ. Educ.*, 40 S.W.3d 784 (Ark. 2001) ...........................................14

*Poole v. Ogiejko*, 880 N.Y.S.2d 123 (N.Y. App. Div. 2009) ........................................................20

*Quinn Cos. v. Herring-Marathon Grp., Inc.*, 773 S.W.2d 94 (Ark. 1989)...................................12

*Reno v. Baird*, 957 P.2d 1333 (Cal. 1998) ..................................................................................15

*Smith v. Dixon*, 386 S.W.2d 244 (Ark. 1965) ..............................................................................19

*Smith v. Figure World Plus, Inc.*, 705 S.W.2d 432 (Ark. 1986)..................................................19

*Springdale Diagnostic Clinic v. Nw. Physicians, L.L.C.*, No. CA 03-103, 2003
    WL 22138591 (Ark. Ct. App. Sept. 17, 2003)..........................................................................15

*Tony Smith Trucking v. Woods & Woods, Ltd.*, 55 S.W.3d 327 (Ark. Ct. App.
    2001) ........................................................................................................................................10

*Travelers Indem. Co. v. Lake*, 594 A.2d 38 (Del. 1991)..............................................................15

*Trujillo v. TK Martial Arts Acad., LLC*, 474 S.W.3d 519 (Ark. Ct. App. 2015)..........................18

*Verson Allsteel Press Co. v. Garner*, 547 S.W.2d 411 (Ark. 1977) ..............................................4

*Windsong Enters., Inc. v. Upton*, 233 S.W.3d 145 (Ark. 2006) ...................................................12

**Federal Statutes**

28 U.S.C. § 1927.................................................................................................................3, 25, 28

**State Statutes**

Ark. Code Ann § 16-56-105(3) (Repl. 2005) ...............................................................................10

Del. Code Ann. § 8106 ..................................................................................................................10

**Rules**

Delaware Rules of Professional Conduct Rule 3.3 ........................................................................25

Fed. R. Bankr. P. 7052....................................................................................................................3

Fed. R. Civ. P. 52 ............................................................................................................................3

Fed. R. Civ. P. 52(c) ....................................................................................................................3-4

**Non-Periodical Publications**

Brill, *Arkansas Law of Damages* § 17:17 ....................................................................................18

1.      Wells Fargo Bank, N.A., as Trustee for the Registered Holders of Comm 2006-C8 Commercial Mortgage Pass-Through Certificates ("Prior Lender"), LNR Partners, LLC ("LNR"), Berkadia Commercial Mortgage LLC ("Berkadia"), Little Rock-400 West Capitol Trust ("Secured Lender"), and Taconic Capital Advisors, LP ("Taconic" and together with Prior Lender, LNR, Berkadia, and Secured Lender, the "Lender Defendants"), pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 52(c) and Federal Rule of Bankruptcy Procedure ("Fed. R. Bankr. P.") 7052, respectfully submit this Memorandum in support of their Motion for a directed judgment as to Counts I, II, III, IV, V, VII, VIII, and IX of Plaintiffs'[1] Second Amended Complaint (the "SAC") and for a rule to show cause, and in support thereof state as follows.

I.      ***SUMMARY OF THE STAGE OF PROCEEDINGS***

2.      Plaintiffs filed this adversary proceeding on April 13, 2018 (J-906), filed their first amended complaint on July 20, 2018 (J-914), and filed their operative complaint (the SAC) on September 5, 2019 (J-083).

3.      Lender Defendants filed a motion for summary judgment, requesting judgment in their favor and against Plaintiffs on Counts I, II, III, IV, V, VII, VIII, and IX of the SAC on November 22, 2019.  (Adv. D.I. 410.)  The Court took Lender Defendants' motion for summary judgment under advisement on December 9, 2019, and the motion remains pending.  (Trial Tr. at 7:9-13.)

---

[1] "Plaintiffs" are the plaintiffs in the above-captioned Adversary Proceeding and the debtors in the above-captioned jointly administered Bankruptcy Cases.

4.      The liability phase of trial was held on December 9-13, 2019 and January 24, 2020.  The parties completed the submission of evidence, including their post-trial submissions of deposition designations and exhibits, and the Court has ruled on the same.

## II.     *SUMMARY OF THE RELIEF SOUGHT AND THE BASES FOR THE SAME*

5.      This Motion seeks two types of relief.

6.      <u>First</u>, Lender Defendants request a directed judgment on Counts I, II, III, IV, V, VII, VIII, and IX of the SAC because Plaintiffs did not offer sufficient evidence at trial to prove those claims by a preponderance of the evidence.  Specifically:

- Counts I, II, III, IV, VII, and IX (the "<u>Loan Claims</u>") allege that Lender Defendants supposedly thwarted a specific refinancing closing date of Friday, September 30, 2016.  (J-083 ¶¶ 52-55.)  Not only did Plaintiffs fail to prove these allegations at trial, the evidence, including Plaintiffs' attorney's trial testimony and written admissions, prove these allegations to be false.  The undisputed facts are that no loan could possibly have closed on September 30, 2016 notwithstanding any alleged act or omission by any Lender Defendant.  Plaintiffs and/or their counsel knew the same at the time Plaintiffs filed their initial complaint, their first amended complaint, and the SAC but Plaintiffs and their counsel nonetheless continued to prosecute what they knew to be baseless claims.

- Plaintiffs' Loan Claims allege that Lender Defendants supposedly caused a potential Property[2] tenant (the Mitchell Williams law firm ("<u>Mitchell Williams</u>")) to terminate its lease.  (J-083 ¶ 55.)  Not only did Plaintiffs fail to prove these allegations at trial, the uncontroverted record (including Mitchell Williams' sworn testimony) confirms that Mitchell Williams terminated its lease for reasons that had absolutely nothing to do with Lender Defendants.  Plaintiffs and/or their counsel knew the same at the time Plaintiffs filed their initial complaint, their first amended complaint, and the SAC but Plaintiffs and their counsel nonetheless continued to prosecute what they knew to be baseless claims.

- Plaintiffs' other claims (Count V (Declaratory Judgment) and Count VIII (the Confidentiality Agreement Claim)) are similarly defective because Plaintiffs offered no evidentiary support for these allegations at trial,

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in Lender Defendants' Proposed Findings of Fact and Conclusions of Law.

thereby establishing that Lender Defendants are also entitled to judgment on these claims.

7.     <u>Second</u>, Lender Defendants request an Order for a Rule to Show Cause as to why Plaintiffs' attorney Mark Rubin did not violate 28 U.S.C. § 1927 by unreasonably and vexatiously multiplying these proceedings by pursuing the Loan Claims based on a failed UBS refinancing, a failed September 30, 2016 Calmwater closing date, and the Mitchell Williams lease termination despite his knowledge, at the time this case was filed, that those claims were baseless.

8.     For these and the following many separate and independent reasons, Lender Defendants request the entry of judgment in their favor on all of the claims pled against them (Counts I, II, III, IV, V, VII, VIII, and IX) and further request that the Court enter an order for Plaintiffs' attorney Mark Rubin to show cause as to why he did not violate 28 U.S.C. § 1927 by unreasonably and vexatiously multiplying these proceedings based on theories that he knew to be baseless at the time Plaintiffs filed this adversary proceeding.

## III.    THE COURT SHOULD GRANT A DIRECTED JUDGMENT IN LENDER DEFENDANTS' FAVOR AS TO COUNTS I, II, III, IV, V, VII, VIII, AND IX

9.     Pursuant to Federal Rule of Civil Procedure 52, incorporated here by Fed. R. Bankr. P. 7052, "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c); Fed. R. Bankr. P. 7052. *See also In re Patchell*, 569 B.R. 635, 649 (Bankr. D. Md. 2017) ("A district court sitting without a jury may enter judgment as a matter of law against a party on any claim once the party has had a full opportunity to present evidence on that claim.") (internal quotation marks omitted).

10.     On a motion pursuant to Rule 52(c), "'the court does not view the evidence through a particular lens or draw inferences favorable to either party.'"  *In re Patchell*, 569 B.R. at 649 (quoting *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 272 (3d Cir. 2010)).  Rather, the Court should "'weigh[] the evidence as it would at the conclusion of the trial,'" (*id.*), and "'make determinations of witness credibility where appropriate,'" *Fagal v. Marywood Univ.*, No. 3:14-CV-02404, 2018 WL 1993790, at *1 (M.D. Pa. Apr. 27, 2018) (quoting *EBC, Inc.*, 618 F.3d at 273), *aff'd*, 786 F. App'x 353 (3d Cir. 2019).

### A.     Plaintiffs Failed To Prove That Lender Defendants Caused The Alleged Harms On Which The Loan Claims Are Based (Counts I-IV, VII, And IX).

11.     Each of the Loan Claims requires proof of causation.  *See Arloe Designs, LLC v. Ark. Capital Corp.*, 431 S.W.3d 277, 282 (Ark. 2014) (breach of contract claim requires proof of causation); *Verson Allsteel Press Co. v. Garner*, 547 S.W.2d 411, 415 (Ark. 1977) (negligence claim requires proof of causation); *A&A Enters., Inc. v. Great Am. Ins. Co.*, 978 F. Supp. 1229, 1231-32 (E.D. Ark. 1997) (tortious interference claim requires proof of causation); *Pa. Emp. Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 485 (D. Del. 2010) (unjust enrichment claim requires proof of causation).

12.     The Loan Claims are all predicated on Plaintiffs' theories that Lender Defendants: (i) prevented a supposed September 30, 2016 closing from occurring by failing to timely provide a payoff statement; (ii) provided a payoff statement on September 30, 2016 that contained a supposedly "illegal" late fee (thereby making "the [Calmwater] loan insufficient to cover the payoff amount"); and (iii) caused Mitchell Williams to terminate its lease by thwarting the supposed September 30, 2016 closing date.  (J-083 ¶¶ 52-55, 81-83, 86-88, 91-95, 98-102, 128-32.)

13.    Plaintiffs did not meet their burden of proving these theories at trial in at least the following three ways:

14.    <u>First</u>, Plaintiffs did not prove their theory that any loan was actually scheduled to close on September 30, 2016.  Lender Defendants' alleged actions and/or inactions therefore could not have "thwarted" a non-existent closing date.  Instead, the following evidence proves that, even if Lender Defendants had provided a payoff statement *prior to September 30, 2016*, and even if that payoff statement had not included a late fee, the potential Calmwater loan would not have closed on September 30, 2016:

- Plaintiffs' own lawyer, Mark Rubin, testified that Calmwater never agreed in writing or orally to close any loan on September 30, 2016.  (Trial Tr. at 1066:5-10.)

- Calmwater's 30(b)(6) designee, Tristine Lim, likewise testified that Calmwater never agreed to close any loan on September 30, 2016, and that as of that date, Calmwater had not yet agreed to any specific closing date. (Lim Dep. at 73:16-24.)

- Mr. Lim also testified that Calmwater was still conducting due diligence as of September 28, 2016, and knew as of that date that it would not be able to complete due diligence (which had to be complete before the loan could close) by September 30, 2016. (Lim Dep. at 53:1-6, 56:4-8, 61:8-11, 73:16-24.)

- Mr. Lim further testified that as of September 30, 2016, one of the conditions precedent to any closing, *i.e.*, execution of a guaranty, was still being negotiated.  (Lim Dep. at 65:20-66:2.)

- As of September 30, 2016, Calmwater had unanswered questions relating to Plaintiffs and needed "backup documentation" for the same.  (J-545.)

- Mark Rubin confirmed in writing to his clients on October 1, 2016 (*i.e.*, *one day **after** September 30, 2016*) that Calmwater: (i) had "not actually committed to the financing"; (ii) had not "agree[d] to move forward"; (iii) was still "continu[ing] to work on the various processes that are required for the transaction"; and  that  there were still a number of "deliverables for both borrower and lender," such as "the negotiation of loan documents, including budgets, reserves, carve-out guarantees and other important elements of the transaction" along with "issues" which still had to be

"resolve[d] with the funding of the Owner Mezz Loan including the formation of a new entity to act as the Mezz lender.  All of these items take time . . . ."  (J-544.)

- Mr. Lim's testimony, Seth Denison's testimony, and the documentary evidence admitted at trial establishes that even as of October 1 through October 12, 2016, numerous required **pre-closing** projects still remained outstanding.  (*See* Lim Dep. at 67:25-69:10, 75:7-24; 85:22-86:4; 87:7-88:12, 88:18-90:6, 90:11-92:5, 92:10-93:2, 93:7-94:12; 99:5-100:9; 101:6-102:1, 102:7-103:2, 103:9-104:4; Denison Dep. at 229:19-232:1, 234:8-22; J-042; J-045; J-202; J-204; J-205; J-206; J-219; J-245; J-246; J-544; J-548; J-553; J-555; J-556; J-558; J-1002; *see also* McGhee Dep. at 192:16-19; Trial Tr. at 195:4-9, 418:21-423:1, 588:6-12.)  Mr. Lim testified that none of these open items related to a late fee or payoff statement.  (Lim Dep. at 84:12-85:7.)

- Plaintiffs and Calmwater were not prepared to close on September 30, 2016.  (Lim Dep. at 53:1-6, 56:4-8, 61:8-15, 65:14-66:12; Trial Tr. at 896:5-20.)

15.     The Court can enter a directed judgment in Lender Defendants' favor on the Loan Claims for this reason alone, and the Court does not need to further consider the Loan Claims.

16.     Second, Plaintiffs did not prove their theory that the payoff amount reflected on the September 30, 2016 payoff statement exceeded Plaintiffs' debt and thereby prevented any September 30, 2016 closing.  Specifically, the September 30, 2016 payoff amount was approximately $28.8 million (J-539) which is indisputably lower than the potential Calmwater loan for $30,000,000 (J-564).

17.     Third, Plaintiffs did not prove their theory that Lender Defendants caused Mitchell Williams to exercise its right to terminate its lease.  Instead, the following evidence establishes that Mitchell Williams terminated its lease because Calmwater would not fulfill Mitchell Williams' escrow demand, because the Calmwater loan never closed, and because Mitchell Williams did not trust Mark Rubin (*i.e.*, because of reasons that have nothing to do with Lender Defendants):

- John Selig, one of Mitchell Williams' 30(b)(6) witnesses, testified that Mitchell Williams stopped pursuing the lease because of the firm's "lack of any real confidence in what Mark Rubin was telling" Mitchell Williams.  (Selig Dep. at 29:17-30:14; *see also* Beard Dep. at 65:17-66:7, 69:25-70:17, 80:3-11; J-505.)

- Mr. Selig also testified that Mitchell Williams stopped pursuing the lease because Plaintiffs' refinance did not close on many different dates that Mr. Rubin had represented it would close.  (Selig Dep. at 30:1-14.)

- Finally, Mr. Selig testified that Mitchell Williams stopped pursuing the lease after Calmwater refused to escrow the firm's construction allowance.  (Selig Dep. at 29:13-16.)  No act or omission by any Lender Defendant caused Mitchell Williams to ask for that construction allowance.  (*See* Selig Dep. at 43:22-44:22.)  To the contrary, Mitchell Williams asked Calmwater to escrow its construction allowance because Mitchell Williams had concerns that: (1) Mark Rubin's repeated representations to the firm would never come to fruition; and (2) the potential loan with Calmwater was a short-term loan thereby increasing the likelihood that Plaintiffs would have to file for bankruptcy.  (Selig Dep. at 15:23-17:16, 22:23-23:21, 26:7-27:24, 29:17-30:14; Beard Dep. at 65:14-66:7, 67:19-68:7, 79:14-80:11, 92:3-10, 102:18-103:8, 105:5-11, 115:16-116:6, 180:19-181:17, 182:4-22; 183:22-194:12.)

**B.      Plaintiffs Failed To Prove That The Alleged Prior Events Are Relevant, And Even If They Are, They Are Partially Time-Barred.**

18.     In addition to their allegations concerning Mitchell Williams and Calmwater, Plaintiffs' SAC also contains a number of assorted and disjointed allegations about: (i) the Friday Firm Lease and Regus Lease approval process; (ii) supposedly delayed reimbursement requests; (iii) a change in the Property manager to FGG; (iv) a potential refinance with Berkadia; and (v) a request by Berkadia for information relating to Plaintiffs' repayment of a mezzanine loan (collectively, the "Alleged Prior Events").  (J-083 ¶¶ 30-42.)  These Alleged Prior Events are irrelevant to this case because: (i) they occurred before and had no impact on the failed Calmwater refinancing process or the Mitchell Williams lease termination; and (ii) the Alleged Prior Events did not cause any of the harms on which Plaintiffs base their SAC.  Moreover, some

7

of Plaintiffs' claims are time-barred to the extent they are based on certain of the Alleged Prior

Events.

19.    <u>First</u>, the following evidence  confirms that the Alleged Prior Events *predated and*

*had no impact on the failed Calmwater refinance and Mitchell Williams lease termination in*

*September and October 2016*:

- The Friday Firm Lease was approved as of **November 5, 2014**.  (Trial Tr. at 314:19-24; *see also* J-1533 (Nov. 5, 2014 email confirming that the Friday Firm lease was approved); J-382 (at attached LNR approval letter (FGG 005836).)

- Plaintiffs' requested reserve reimbursements related to the Friday Firm Lease on **November 8, 2014**, and those funds were released approximately "one month" later (*i.e.*, in **December of 2014**).  (Trial Tr. at 321:4-324:20; J-237; J-238; J-383.)

- The Regus Lease was submitted to Prior Lender for approval on **September 26, 2015**, Plaintiffs received approval from Prior Lender on **November 6, 2015**, Plaintiffs submitted a revised request for reimbursement relating to the Regus Lease (after their initial request was denied for having been submitted before the Regus Lease was approved) on **April 28, 2016**, and Plaintiffs received funds for the commission related to the Regus Lease on **June 7, 2016**. (Trial Tr. at 1379:2-1380:22 (Plaintiffs submitted the Regus Lease for approval on 9/26/2015), 1383:12-1384:8; J-390 (P. Getty's 9/26/2015 email submitting the Regus Lease); J-610 at LNR0009881 (explaining why initial reserve request was denied), LNR0009884, and at last page (not bates stamped), Regus line entry under 4/28/2016 and total 6/7/16 disbursement line entry.)

- The FGG Property manager approval process occurred **in 2014 and 2015**. (Trial Tr. at 326:6-327:8 (discussing J-268).)

- Plaintiffs' preliminary inquiries concerning a potential refinance with Berkadia took place in **April-June of 2016**. (J-456 at BER0003795-97.)

- Ms. McGhee notified Mr. Rubin of the mezzanine loan issue on **August 18, 2016** and the issue was resolved on **September 23, 2016**.  (Trial Tr. at 1224:4-24; J-469; J-470; J-513.)

20.    <u>Second</u>, Plaintiffs did not offer and could never offer evidence proving that the

Alleged Prior Events caused the harms on which the Loan Claims are based.  Specifically,

Plaintiffs stipulated that the failed UBS loan did not cause them any damages. Moreover, Plaintiffs presented no evidence that the Alleged Prior Events prevented any Calmwater closing or caused Mitchell Williams to terminate its Lease. Additionally, the following evidence proves that the Alleged Prior Events *did not* cause any of the harms on which the Loan Claims are based:

- With respect to the Friday Firm and Regus Lease approvals, reimbursement requests, and the process of seeking approval of FGG as property manager, Lori McGhee testified that these Alleged Prior Events did not: (i) impact any UBS or Calmwater closing; (ii) impact the Mitchell Williams lease termination; (iii) cause the September 1, 2016 maturity default; or (iv) cause Plaintiffs to file for bankruptcy. (Trial Tr. at 380:19-383:3.)

- With respect to the process of seeking the approval of FGG as Property manager, Ms. McGhee testified that FGG served as the asset and Property manager from approximately 2013 through 2016, and that to her knowledge, Lender Defendants never challenged FGG's authority to act as asset manager (Trial Tr. at 386:16-389:16), regardless of whether FGG was ever formally approved to act in that role. FGG's corporate representative, Paul Getty, testified to the same facts. (*See* Getty Dep. at 193:23-194:16.) (*See also* J-083 (SAC) ¶ 41; Trial Tr. at 332;21-333:4, 389:4-390:19.)

- With respect to the potential refinance with Berkadia, Mr. Rubin testified that his discussions concerning this potential refinance in April-June 2016 did not stop him from at the same time continuing to pursue refinance opportunities with other potential lenders. (Rubin Dep. at 213:13-20, 228:8-229:12; *see also* Trial Tr. at 866:12-17.) The evidence (including Mr. Rubin's contemporaneous written statements) likewise confirms that the discussions concerning a potential refinance with Berkadia did not have any impact on Plaintiffs' attempts to secure financing. (J-456 at BER0003795.)

- With respect to the mezzanine loan issue, Mr. Rubin testified that (i) as of August 18, 2016, he knew that the lender required proof that the Plaintiffs' mezzanine loan had been paid in full (Trial Tr. at 1224:4-24), and (ii) the mezzanine loan request had no impact on the UBS loan closing date (Trial Tr. at 1227:16-1228:15). The evidence also shows that the mezzanine loan issue was resolved on September 23, 2016 (*i.e.*, a week before the supposed September 30, 2016 closing date). (J-469, J-470, J-471, J-479, J-513.) Plaintiffs offered no contrary evidence at trial.

21.    _Third_, Plaintiffs' claims for breach of contract (Counts I and IX), Negligence (Count II), Tortious Interference (Count III), and Aiding and Abetting Tortious Interference (Count IV) are time-barred to the extent they are based on: (i) the alleged delay in approving the Friday Firm lease in 2014; (ii) the alleged delay in releasing reserve funds related to the Friday Firm lease in 2014; and/or (iii) any alleged delays in approving FGG as property and asset manager that took place prior to April 13, 2015.  (_See_ Adv. D.I. 1 (Adversary Complaint filed on April 13, 2018); _see also_ 10 Del. Code Ann. § 8106; Ark. Code Ann § 16-56-105(3) (Repl. 2005); _Tony Smith Trucking v. Woods & Woods, Ltd._, 55 S.W.3d 327, 330 (Ark. Ct. App. 2001).[3]

**C.    Plaintiffs Failed To Prove The Other Essential Elements Of Their Loan Claims (Counts I-IV, VII, And IX).**

**1.    Plaintiffs Failed To Prove That Prior Lender Breached Any Contract (Count I For Breach Of Contract Against Prior Lender).**

22.    To prevail on Count I, Plaintiffs have the burden of proving that Prior Lender breached an actual provision of the Loan Documents.[4]  _See, e.g._, _Ramthun v. Bryan Career College-Inc._, 93 F. Supp. 3d 1011, 1023 (W.D. Ark. 2015) (confirming that under Arkansas law the elements of a breach of contract claim include that "the contract required the defendant to perform a certain act").  Plaintiffs failed to carry this burden for the following two reasons:

23.    _First_, Plaintiffs did not prove that Prior Lender breached any provision of the Loan Documents that "required" Prior Lender "to perform a certain act."

---

[3] Even Plaintiffs' own attorney Guy Rubin tacitly acknowledged the weakness of Plaintiffs' Loan Claims.  In his opening statement, he did not mention UBS, Calmwater, or Mitchell Williams.  (Trial Tr. at 21-43.)  Mr. Rubin ignored them notwithstanding that the majority of the Complaint, and the resulting time-consuming and expensive discovery, was based on allegations concerning UBS, Calmwater, and Mitchell Williams.

[4] "Loan Documents" refers to the $32 million promissory note dated August 18, 2006 ("Note") (J-264) and the August 18, 2006 Loan Agreement ("Loan Agreement") (J-263).

24.    <u>Second</u>, Prior Lender did not engage in any of the alleged misconduct on which

Count I is based.  (*See supra* Sections III.A & B.)[5]

**2.    Plaintiffs Failed To Prove That Any Lender Defendant Owed Or Breached A Tort Duty (Count II For Negligence Against Prior Lender, Berkadia, And LNR).**

25.    To prevail on Count II, Plaintiffs have the burden of proving that Prior Lender,

Berkadia, and/or LNR owe Plaintiffs a tort duty.  *Cross v. W. Waste Indus.*, 469 S.W.3d 820, 825

(Ark. Ct. App. 2015).  Plaintiffs did not meet their burden of proof on Count II in the following

three ways:

26.    <u>First</u>, as described in Sections III.A & B above, Plaintiffs failed to prove that Prior

Lender, Berkadia, or LNR engaged in any of the alleged misconduct at issue.  This is alone a

sufficient basis for the Court to enter a directed judgment in Prior Lender, Berkadia's, and

LNR's favor.

27.    <u>Second</u>, Plaintiffs' negligence claim is based on the exact same conduct which

forms the basis for Plaintiffs' breach of Plaintiffs' breach of contract claim against Prior Lender

(*Compare* J-083 ¶¶ 80-83 *with* ¶¶ 85-88.)  But under Arkansas law, a "plaintiff may not

transform a breach of contract action into a tort claim by alleging the breach was motivated by

malice.  The breach itself simply is not a tort." *Quinn Cos. v. Herring-Marathon Grp., Inc.*, 773

S.W.2d 94, 94 (Ark. 1989).  Prior Lender is therefore entitled to a directed judgment on Count II

for this separate and additional reason.

---

[5] While somewhat unclear, Plaintiffs appear to allege in the SAC that Prior Lender also breached the duty of good faith and fair dealing. (J-083 ¶¶ 79-82.)  But any such claim, to the extent Plaintiffs intend to pursue it, should be rejected because that type of claim requires Plaintiffs to demonstrate the breach of an express contract term, *Ark. Research Med. Testing, LLC v. Osborne*, 2011 Ark. 158, at 6, 2011 WL 1423993, at *3 (2011). Plaintiffs cannot and did not do so as detailed in Sections III.A & B.

28.     <u>Third</u>, Plaintiffs cannot prevail on their negligence claim as a matter of law

because they did not prove the existence of a "relationship of special trust and confidence." *See*

*Arloe Designs, LLC*, 431 S.W.3d at 281 (in affirming the grant of summary judgment dismissing

the negligence claim, the court found no evidence of "a relationship of special trust and

confidence"); *Mans v. Peoples Bank of Imboden*, 10 S.W.3d 885, 889-90 (Ark. 2000) (affirming

lower court in holding that the defendant did not owe the plaintiff any duty and concluding that

the plaintiff was "off the mark" in arguing that the defendant bank owed her a legal duty because

she had not proven that her relationship with the bank was "more than one of debtor and

creditor").

> **3.     Interfered With Any Recognizable Business Expectancy (Count III
> For Tortious Interference Against Prior Lender, Berkadia, And
> LNR).**

29.     Plaintiffs' Count III is based upon Prior Lender's, Berkadia's, and LNR's

allegedly tortious interference with the Mitchell Williams lease.  (J-083 ¶¶ 91-102.)  Plaintiffs

failed to prove this claim in the following three ways.

30.     <u>First</u>, under Arkansas law, "[t]here can be no claim for tortious interference where

a business expectancy is subject to a contingency."  *See, e.g.*, *Mercy Health Sys. Of Nw. Ark.,*

*Inc. v. Bicak*, 383 S.W.3d 869, 876 (Ark. App. 2011); *see also Deck House, Inc. v. Link*, 249

S.W.3d 817, 827-28 (Ark. Ct. App. 2007); *Windsong Enters., Inc. v. Upton*, 233 S.W.3d 145,

150 (Ark. 2006) (stating, "an expectancy subject to a contingency, which occurred, is not tortious

interference with business expectancy" (internal citation omitted)).  The following evidence

establishes that the Mitchell Williams lease (*i.e.*, the "business expectancy" on which Count III is

based) was subject to multiple distinct contingencies:

- The Mitchell Williams lease was at all times expressly contingent upon
  Plaintiffs refinancing their Loan.  (Trial Tr. at 975:2-976:2 (Mark Rubin

testifying that the Mitchell Williams lease and all amendments thereto were conditioned on the loan being obtained); J-083 ¶ 53 (Plaintiffs' SAC stating that the Mitchell Williams lease "was set to automatically terminate if the refinancing did not take place"); J-003 (email attaching Mitchell Williams lease) at Section 2.8 (the "<u>Loan Contingency Clause</u>"); J-005, J-504, J-007, J-361, J-019 (multiple amendments to the Mitchell Williams lease, each preserving the Loan Contingency Clause); J-521 at 6:4-13 (Mark Rubin describing that the Mitchell Williams Lease was "contingent upon us getting a new loan"); Beard Dep. at 45:18-25, 46:20-24.)

- The Mitchell Williams lease was also at all times contingent upon Plaintiffs completing the roll up of their interests (which never occurred). As Mark Rubin testified, the Mitchell Williams lease was "with the [Plaintiffs'] roll up entity, and it was to be effective on the date of the closing [of the potential refinance.]" (Trial Tr. at 953:14-954:1; *see also* Beard Dep. at 39:15-40:23.)

- Pursuant to the second amendment to the Mitchell Williams lease (dated September 9, 2016), the Mitchell Williams lease was also contingent upon the landlord providing: (i) evidence that the landlord had received all approvals for Mitchell Williams' exterior signage on the building; (ii) a revised Subordination, Non-Disturbance and Attornment Agreement and Tenant Estoppel Certificate; and (iii) a proposed amendment to Exhibit B of the lease, outlining how the Construction Allowance would be reimbursed. (J-005.)

- Pursuant to the fifth amendment to the Mitchell Williams lease (dated October 3, 2016), the Mitchell Williams lease was also contingent upon the express approval of Mitchell Williams' membership to proceed with the lease. (J-361.)

- The Mitchell Williams Lease was also contingent on Calmwater escrowing Mitchell Williams' entire construction allowance. (J-019 at MW0000072 (J. Selig's 10/6/2016 email).)

31.   <u>Second</u>, to prevail on Count III, Plaintiffs were required to prove that Lender

Defendants engaged in "conduct *toward a third party*" (*i.e.*, Mitchell Williams). *Pighee v.*

*L'Oreal USA [Prods.], Inc.*, 351 F. Supp. 2d 885, 896 (E.D. Ark. 2005) (emphasis in original,

internal quotation marks omitted); *Navorro-Monzo v. Hughes*, 763 S.W.2d 635, 636 (Ark. 1989)

("An action for tortious interference with a contractual relationship is based upon a defendant's

conduct toward a third party."); *Palmer v. Ark. Council on Econ. Educ.*, 40 S.W.3d 784, 791 (Ark. 2001) ("An action for tortious interference with a contractual relationship is based upon a defendant's conduct toward a third party." (internal citation omitted)); *see also Baptist Health v. Murphy*, 373 S.W.3d 269, 283 (Ark. 2010) (citing *Parlmer v. Ark. Council on Econ. Educ.*, "an action for tortious interference with a contractual relationship is based upon a defendant's conduct toward a third party.").  Plaintiffs did not prove that any Lender Defendant even communicated in any way with Mitchell Williams, much less that any Lender Defendant somehow directed conduct toward Mitchell Williams.  To the contrary, the evidence establishes that Lender Defendants did not direct any conduct toward or communicate with Mitchell Williams.  (Selig Dep. at 43:22-44:22.)

32.     <u>Third</u>, as set forth above in Sections III.A & B, Plaintiffs failed to prove that any act by Prior Lender, Berkadia, or LNR actually interfered with the Mitchell Williams lease.

### 4.     Plaintiffs Failed To Prove That Berkadia Or LNR Aided And Abetted Any Alleged Tort (Count IV For Aiding And Abetting Against Berkadia And LNR).

33.     The Court should grant a directed judgment on Count IV for at least the following two separate and independent reasons.

34.     <u>First</u>, Plaintiffs failed to prove their "aiding and abetting" tortious interference claim for the same reasons they failed to prove their tortious interference claim.  *See Hinton v. Bryant*, 367 S.W.2d 442, 445 (Ark. 1963) (confirming that a plaintiff cannot prevail on an aiding and abetting claim where they cannot prove the underlying tort).

35.     <u>Second</u>, Plaintiffs failed to prove their "aiding and abetting" claim because it is axiomatic that a party cannot aid and abet itself (which is exactly what Plaintiffs are arguing here given their position that Berkadia and LNR are Prior Lender's agents).  *See, e.g., Springdale*

*Diagnostic Clinic v. Nw. Physicians, L.L.C.*, No. CA 03-103, 2003 WL 22138591, at *4 (Ark.

Ct. App. Sept. 17, 2003) (distinguishing party who committed tort from one found to "aid or abet

its commission"); *see also Reno v. Baird*, 957 P.2d 1333, 1342 (Cal. 1998) ("'The concept of

aiding and abetting involves two separate persons, one helping the other.'"); *Cornell Glasgow,*

*LLC v. La Grange Props., LLC*, No. N11C-05-016 JRS CLLD, 2012 WL 2106945, at *11 (Del.

Super. Ct. June 6, 2012) ("[A]gents cannot aid and abet their principal . . . .").

> **5.    Plaintiffs Failed To Prove The Essential Elements Of Their Unjust Enrichment Claim (Count VII For Unjust Enrichment Against Taconic and Secured Lender).**

36.    Plaintiffs failed to prove the essential elements of their unjust enrichment claim

against Taconic and Secured Lender for at least the following two reasons.

37.    <u>First</u>, Plaintiffs and Secured Lender have a contract (the Loan Documents) and

Plaintiffs therefore cannot assert an unjust enrichment claim against Secured Lender as a matter

of established Delaware law.[6]  *Air Prods. & Chems., Inc. v. Wiesemann*, 237 F. Supp. 3d 192,

216 (D. Del. 2017) ("'Delaware courts . . . have consistently refused to permit a claim for unjust

enrichment when the alleged wrong arises from a relationship governed by contract.'"); *see also*

*In re HH Liquidation, LLC*, 590 B.R. 211, 285 (Bankr. D. Del. 2018); *In re Integrated Health*

*Servs., Inc.*, 307 B.R. 794, 800 (Bankr. D. Del. 2004).  Secured Lender is entitled to judgment on

Count VII for this reason alone.

---

[6] Plaintiffs' Count VII is governed by Delaware law because Plaintiffs are Delaware limited liability companies (J-083 ¶ 16), Secured Lender is a Delaware trust (J-083 ¶ 20), and Taconic is a Delaware limited partnership (J-862 at p. LNR0000428 (defining "Buyer's Principal" as a "Delaware limited partnership").  *See Travelers Indem. Co. v. Lake*, 594 A.2d 38 (Del. 1991) (confirming that Delaware law applies to tort claims where the parties transact business in Delaware).

38.     <u>Second</u>, Plaintiffs were required to prove that they conferred a benefit on Taconic.

*In re W.J. Bradley Mortg. Capital, LLC*, 598 B.R. 150, 177 (Bankr. D. Del. 2019).  Plaintiffs

presented no evidence to prove this essential element.

39.     <u>Third</u>, to prevail on Count VII, Plaintiffs were required to prove that it is "unjust"

for Taconic or Secured Lender to retain any enrichment conferred by Plaintiffs.  *In re W.J.*

*Bradley Mortg. Capital, LLC*, 598 B.R. 150, 177 (Bankr. D. Del. 2019).  Specifically, Plaintiffs

must establish a "causal nexus between the alleged wrongful conduct and the injuries suffered."

*Zeneca*, 710 F. Supp. 2d at 485; *U.S. Bank Nat'l Ass'n v. Gunn*, No. 11-cv-01155-RGA, 2015

WL 4641611, at *5 (D. Del. Aug. 5, 2015) ("Plaintiffs have not demonstrated that Defendant

was enriched and they were impoverished.").  While somewhat unclear, Plaintiffs appear to

allege that they were "impoverished" because of the failed Calmwater refinancing and Mitchell

Williams lease and the expenses Plaintiffs incurred as a result of their Maturity Date default and

bankruptcy filings.  (J-083 ¶¶ 55, 76.)  Plaintiffs, however, did not offer any evidence that (i)

Taconic or Secured Lender were "enriched," or (ii) that Plaintiffs were "impoverished" because

of Taconic and/or Secured Lender's actions or inaction.  To the contrary, the evidence

establishes that Secured Lender did not purchase the Note until June of 2017, and Plaintiffs

presented no evidence that Taconic and Secured Lender were in any way involved with Plaintiffs

before that date, much less any evidence that Taconic or Secured Lender caused Plaintiffs to be

"impoverished" by defaulting on their Loan or filing for bankruptcy.  (J-862.)

> **6.      Plaintiffs Failed To Prove That Secured Lender Breached Any**
> **Contract (Count IX For Breach Of Contract Against Secured**
> **Lender).**

40.     Secured Lender is entitled to a directed judgment on Count IX for at least two

separate and independent reasons.

41.     <u>First</u>, Plaintiffs were required to but failed to prove that Secured Lender breached any contract.  *See, e.g.*, *Ramthun*, 93 F. Supp. 3d at 1023.  Indeed, Plaintiffs presented no evidence that Secured Lender was a party to any of the Loan Documents or any other contract with Plaintiffs at the time the alleged breaches pled in the Complaint actually occurred (*i.e.*, before June 13, 2017), or that Secured Lender committed any of those alleged breaches.   (J-083 ¶¶ 30-64); *see also Adams' Adm'rs v. Huffington's Adm'rs*, 2 Del. Cas. 656, 659, 1821 WL 1020, at *2 (Del. 1821) ("assignees are not liable for any breach before the assignment").

42.     <u>Second</u>, Plaintiffs failed to prove the other elements of a breach of contract claim (*e.g.*, causation) for the same reasons set forth in Sections III.A & B, *supra*.

**7.      A Directed Judgment Is Proper On The Loan Claims For The Additional Reason That They Are Barred By The Loan Documents' Enforceable Liability Limitation.**

43.     The Court should grant a directed judgment in Lender Defendants' favor on all of the Loan Claims for the separate and independent reason that the Loan Claims are barred by the Loan Documents' enforceable liability limitation.

44.     The Loan Claims seek to recover damages based on one or more of the Lender Defendants allegedly "refusing to timely provide a payoff statement," "unreasonably thwarting" Plaintiffs' refinancing efforts, "unreasonably providing an inaccurate payoff statement," and "unreasonably causing the Mitchell Williams lease to be terminated."  (J-083 ¶¶ 80-83, 86-88, 91-95, 98-102, 119, 128-32.)

45.     The Loan Agreement, however, bars Plaintiffs from recovering monetary damages in connection with any such alleged unreasonable conduct or delays.  (J-263 § 18.6.)

46.     Liability limitations like the one found in Section 18.6 of the Loan Agreement are enforceable, and a directed judgment on all of Plaintiffs' Loan Claims is therefore proper for this additional reason.  *See Finagin v. Ark. Dev. Fin. Auth.*, 139 S.W.3d 797 (Ark. 2003); *Nat'l Union*

*Fire Ins. Co. of Pittsburgh, Pa. v. Guardtronic, Inc.*, 64 S.W.3d 779 (Ark. Ct. App. 2002); *LNV*

*Corp. v. Becton*, No. 3:11-cv-00062-BRW, 2012 U.S. Dist. LEXIS 43324, at *8-10 (E.D. Ark.

Mar. 29, 2012); *Trujillo v. TK Martial Arts Acad., LLC*, 474 S.W.3d 519, 524 (Ark. Ct. App.

2015); Brill, *Arkansas Law of Damages* § 17:17 Contractual limitations on damages (2019).

### D.     Plaintiffs Failed To Prove Their Declaratory Judgment Claim Against Secured Lender (Count V).

47.     Plaintiffs' Count V seeks the entry of an order declaring that the approximately

$1.2 million late fee reflected in the September 30, 2016 payoff statement "is contractually

impermissible and illegal."  (J-083 ¶ 105.)  Secured Lender is entitled to a directed judgment on

this claim for at least the following three reasons.

48.     <u>First</u>, the late fee is not "contractually impermissible" as Plaintiffs allege.  Instead,

the late fee is expressly permitted under the Note which provides in relevant part that:

> If any principal or interest payment is not paid by Borrower before the fifth (5th)
> day after the date the same is due . . . Borrower shall pay to Lender upon demand
> an amount equal to the lesser of the amount of four percent (4%) of such unpaid
> sum or the maximum amount permitted by applicable law in order to defray the
> expense incurred by Lender in handling and processing such delinquent payment
> and to compensate Lender for the loss and use of such delinquent payment.

(J-264, Art. 8.)

49.     <u>Second</u>, and contrary to the complaint, the Note's late fee provision is enforceable

under Arkansas law because it does nothing more than require Plaintiffs to bear the costs caused

by their late payment (or in this case, their non-payment upon the Maturity Date).  *See, e.g.*,

*Smith v. Figure World Plus, Inc.*, 705 S.W.2d 432, 433 (Ark. 1986); *Coffelt v. Ark. Power &*

*Light Co.*, 451 S.W.2d 881, 882-83 (Ark. 1970).  Indeed, late fees are presumptively reasonable

under Arkansas law and it is Plaintiffs' burden to prove otherwise, which they failed to do at

trial.  *See Hayes v. First Nat'l Bank of Memphis*, 507 S.W.2d 701, 703 (Ark. 1974).  This is

particularly true where, as here, the late fee is "fixed in amount" and "assessed as a one-time

charge" and therefore has the entirely proper and enforceable purpose of "induc[ing] prompt payment" and where "the borrower has it in his power to avoid the charges." *Smith*, 705 S.W.2d at 433; *see also Hayes*, 507 S.W.2d at 703 ("The rationale of these cases and others like them is that agreements for penalties to induce prompt payment are free from usury, because the buyer has it in his power to avoid the penalty by discharging the debt when it is due.").

50.    <u>Third</u>, the late fee is not an "illegal" or "improper" liquidated damages provision. Specifically, case law from "other jurisdictions suggests that a small percentage late charge on a commercial loan is simply part of the cost of doing business" and courts routinely uphold a "five percent fixed late charge negotiated between sophisticated commercial entities [as] a valid measure of liquidated damages." *MetLife Capital Fin. Corp. v. Wash. Ave. Assocs. L.P.*, 732 A.2d 493, 499-502 (N.J. 1999); *Smith v. Dixon*, 386 S.W.2d 244, 248 (Ark. 1965) (enforcing stipulated damages provision that "amount[ed] to only 7 1/2%" of the contract price).

51.    Here, Plaintiffs are sophisticated investors. (J-263 § 5.24(g).)  They expressly agreed to pay the late fee and that the late fee would "defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment." (J-264, Art. 8.)  The late fee is therefore "proportion[al] to the damages which the parties contemplated might flow from" default and is enforceable (*i.e.*, the late fee is not an "illegal" or "improper" liquidated damages clause). *Alley v. Rodgers*, 599 S.W.2d 739, 741 (Ark. 1980).

**E.    Plaintiffs Failed To Prove That Taconic Is A Party To The Master Confidentiality Agreement Or That Plaintiffs Were Harmed By Any Alleged Breach Of That Agreement (Count VIII).**

52.    Taconic is entitled to a directed judgment on the Confidentiality Agreement claim because: (1) Plaintiffs failed to prove that Taconic is a party to the Master Confidentiality

Agreement ("MCA"); and (2) Plaintiffs failed to prove that they were in any way harmed by an alleged breach of the MCA.

          **1.**      **Taconic Is Not A Party To The MCA And Plaintiffs Failed To Prove Otherwise.**

53.      To prevail on Count VIII, Plaintiffs were required to prove that Taconic is a party to the MCA. *See, e.g.*, *JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 893 N.Y.S.2d 237, 238-39 (N.Y. App. Div. 2010).[7] Plaintiffs' theory against Taconic on Count VIII is that Taconic was Somera's "undisclosed principal" and is therefore a party to the Master Confidentiality Agreement (even though Taconic is not named as such a party). (J-083 ¶ 122.)

54.      "'An agency relation exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act.'" *In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d 56, 74 (S.D.N.Y. 2009), *aff'd*, 502 F. App'x 66 (2d Cir. 2012). This requires proof that the purported "'agent acts subject to the principal's direction and control.'" *In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 321-22 (S.D.N.Y. 2019); *Poole v. Ogiejko*, 880 N.Y.S.2d 123, 125 (N.Y. App. Div. 2009).

55.      Plaintiffs failed to prove that Taconic and Somera had an agency relationship in connection with the MCA for at least three reasons.

56.      <u>First</u>, Plaintiffs presented no evidence that Taconic agreed to have Somera act as Taconic's agent with respect to the MCA. *See Iannuzzi v. Am. Mortg. Network, Inc.*, 727 F. Supp. 2d 125, 140 (E.D.N.Y. 2010) (finding no agency relationship where the alleged principal never agreed to have the alleged agent "act as its agent"). Moreover, the opposite is true because Somera and Taconic testified to facts confirming that Somera did not act on Taconic's behalf

---

[7] The MCA is governed by New York law. (J-159 ¶ 13.)

with respect to the MCA, the Loan, or the Property.  (Jordan Dep. at 42:16-20, 216:23-217:21, 238:2-239:19; Ross Dep. at 29:16-30:5, 174:12-175:22, 176:6-14, 199:13-200:2, 202:20-203:12, 212:7-213:12; *see also* Ross. Dep. at 168:22-23 ("[W]e weren't involved at all in their acquisition of the note."); Trial Tr. at 793:22-794:17, 796:3-797:6; *see also* Jordan Dep. at 118:20-119:16, 238:2-239:19, 241:5-6.)

57.     Second, the evidence establishes that Taconic never paid Somera any money in connection with the MCA.  (Trial Tr. at 789:20-23, 819:11-13, 820:4-15; Ross Dep. at 31:19-32:3; *see also* Jordan Dep. at 101:20-102:3, 212:22-25.)   Plaintiffs offered no evidence showing otherwise.  *See Iannuzzi*, 727 F. Supp. 2d at 140 (finding no agency relationship where the alleged principal never paid the alleged agent "any consideration").

58.     Instead of proving an "agency" relationship, the undisputed evidence instead proves that Somera acted as a "finder" or a "middleman" for potential deals, (Ross Dep. at 23:7-22, 174:12-175:22, 176:6-14, 213:6-12; Jordan Dep. at 40:17-41:7, 64:24-66:3, 217:22-218:4, 238:2-239:23), which does not establish an agency relationship as a matter of law.  *See, e.g.*, *Laugh Factory, Inc. v. Basciano*, 608 F. Supp. 2d 549, 563 (S.D.N.Y. 2009) (granting summary judgment in favor of "finder" who "referred prospective tenants to defendants" in the absence of evidence that "any defendant either had agreed that Kolbert would act on its behalf in an ongoing way or exercised meaningful control over Kolbert"); *In re Kalisch*, 413 B.R. 115, 131 (Bankr. S.D.N.Y. 2008) ("The factors show a mutually beneficial business relationship but do not prove agency.  Janovich functioned as an independent, economically motivated 'friend' of the deal."), *aff'd*, No. 09 Civ. 1636 (PKC), 2009 WL 2900247 (S.D.N.Y. Sept. 9, 2009); *Ne. Gen. Corp. v. Wellington Advert., Inc.*, 604 N.Y.S.2d 1, 4 (N.Y. 1993) (holding that "[t]his finder had no explicit or implied power to bind Wellington.  This finder did not have the power to negotiate the

transaction. This finder did not have the power to do anything except find and introduce prospects"); *Balheimer v. Reichhardt*, 55 How. Pr. 414, 416, 1878 WL 11302, at *1 (N.Y. Sup. Ct. 1878) ("Roth was to be considered simply as a middleman, to bring the parties together to enable them to make their own bargain.").

### 2. Plaintiffs Failed To Prove That The Note Sale Harmed Them.

59.     Taconic is entitled to a directed judgment on Count VIII for the additional reason that Plaintiffs were required to but failed to prove that the June 13, 2017 Note sale[8] from Prior Lender to Secured Lender in any way harmed Plaintiffs. *See, e.g.*, *Gordon v. Dino De Laurentiis Corp.*, 529 N.Y.S.2d 777, 779 (N.Y. App. Div. 1988) (dismissing complaint that "does not demonstrate how the defendant's alleged breach of the confidentiality agreement caused plaintiffs any injury"). The evidence instead conclusively proves that the Note sale did nothing more than transfer the Loan Documents from one lender to another, but the Loan Documents (and Plaintiffs' obligations thereunder) remained the same. (J-862.)

60.     <u>First</u>, Plaintiffs alleged that the June 13, 2017 Note sale "destroyed [Plaintiffs'] ability to finalize a settlement of the loan with [Prior Lender] on favorable terms." (J-083 ¶ 75.) But the evidence proves the opposite: Prior Lender had actually offered to settle with Plaintiffs on May 9, 2017 (*i.e.*, after April 2017) and *Plaintiffs* ended those discussions on June 7, 2017 when their attorney Mark Rubin told Prior Lender's attorneys that "the owners [*i.e.*, Plaintiffs] do not have a counter offer . . . at this time." (J-804.)

61.     <u>Second</u>, Plaintiffs alleged that the Note sale caused harm in the form of "legal fees and expenses, lost opportunity costs, lost profits and costs of delay." (J-083 ¶ 124.) But

---

[8] This Note sale occurred after Plaintiffs' unsuccessful attempts in 2014 and 2015 to sell the Property, or to refinance the Loan with numerous lenders. The Note sale also occurred after the UBS and Calmwater refinancings fell through, and after Mitchell Williams had terminated its lease.

neither Taconic nor Secured Lender caused those harms (nor did any other Defendant).  Instead,

the trial evidence shows that Plaintiffs caused those harms when they:

- Failed to repay the Loan on the Maturity Date for reasons that had nothing to do with Lender Defendants (*see* Trial Tr. at 1227:16-10 (Mr. Rubin confirming that he wrote on August 31, 2016 that Plaintiffs were unable to close the UBS loan before the maturity date because of "complexities related to the roll-up of 35 tenants in common"); *see also* J-479 (UBS term sheet dated June 13, 2016, providing for exclusivity through August 31, 2016 at 5:00 PM, meaning that UBS was Plaintiffs' only option for a refinance to close before the September 1, 2016 maturity date) *and* J-965 (stipulation confirming that Lender Defendants' conduct did not cause Plaintiffs any damages with respect to the UBS refinance));

- Failed to obtain refinancing both before and after the Maturity Date (*see* J-965 (stipulation confirming that Lender Defendants' conduct did not cause Plaintiffs any damages with respect to the UBS refinance); *see also supra* Section III.A (confirming that Lender Defendants did not cause the Calmwater refinance to fail) *and infra* ¶ 62 (confirming that Lender Defendants' actions did not cause the Ladder Capital refinance to fail));

- Chose, on their own, to retain one or more attorneys to represent them and to pursue this adversary proceeding (J-114 (Doug Laird writing on April 28, 2016 that the Plaintiffs had hired Mark Rubin to "help [them] with litigation"); Trial Tr. at 1007:11-17 (Mark Rubin testifying that the Plaintiffs' plan was to use litigation as a means to make LNR do what the TIC group wanted); Getty Dep. at 68:9-12 (testifying that Plaintiffs hired Mark Rubin to be their "LNR litigator")); and

- Chose, on their own, to file for bankruptcy as a "strategy" to "keep[] all options open" and create "leverage" (J-619).

62.     Third, Mark Rubin testified at trial that the Note sale harmed Plaintiffs because it

caused them to stop moving forward with a potential refinance with Ladder Capital and that the

"terms" of the potential Ladder Capital refinance "changed" after Secured Lender bought the

Note.  (Trial Tr. at 912:9-913:14, 1195:3-8.)  But as Mr. Rubin subsequently acknowledged only

after targeted cross-examination, Ladder Capital expressly told Mr. Rubin that it was willing to

move forward with the potential refinance after the Note sale *pursuant to the exact same terms it*

*had discussed with Plaintiffs pre-Note sale*, meaning that the Note sale had no impact on the

Plaintiffs' potential refinance with Ladder Capital.  (J-1133 (Adam Siper of Ladder Capital

stated in a November 30, 2017 email (*i.e.*, over five months *after* the Note sale) that Ladder

Capital would "very much like to refinance your existing loan per the terms of the loan

application you have previously executed with Ladder."), Trial Tr. at 1195:3-1197:22 (Mark

Rubin confirming on cross-examination that Mr. Siper was willing to move forward with a

refinancing after the Note sale pursuant to the same terms discussed pre-Note sale).)

> **F.      Lender Defendants Are Entitled To Reasonable Attorneys' Fees And Costs Incurred In Defending Against This Adversary Proceeding.**

63.      The Loan Agreement requires Plaintiffs to pay "all reasonable costs and expenses

(including reasonable, actual attorneys' fees and disbursements . . . ) reasonably incurred by

Lender in accordance with this Agreement in connection with . . . (g) enforcing or preserving any

rights . . . ; and (h) enforcing any obligations of or collecting any payments due from Borrower

under this Agreement" and further requires Plaintiffs to pay "all costs of collection and defense,

including attorneys' fees and costs, incurred by Lender" in the event "Lender exercises any of its

[] remedies under this Agreement or any of the other Loan Documents[.]"  (J-263 (Loan

Agreement) §§ 17.5, 17.6.)  Lender Defendants are therefore entitled to reasonable attorneys'

fees and costs incurred in defending against this Adversary Proceeding.

## IV.     *THE COURT SHOULD ENTER AN ORDER FOR A RULE TO SHOW CAUSE*

64.      28 U.S.C. § 1927 provides that:

> Any attorney or other person admitted to conduct cases in any court of the United
> States or any Territory thereof who so multiplies the proceedings in any case
> unreasonably and vexatiously may be required by the court to satisfy personally
> the excess costs, expenses, and attorneys' fees reasonably incurred because of
> such conduct.

> *See also In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90 (3d Cir. 2008); 444 B.R. 286

(Bankr. D.N.J. 2011); *In re Am. Remanufacturers, Inc.*, 453 B.R. 235, 242 (Bankr. D. Del. 2011).

65.     Rule 3.3 of the Delaware Rules of Professional Conduct provides in relevant part that:

(a) A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer; (2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or (3) offer evidence that the lawyer knows to be false. . . .

66.     The Delaware Principles of Professional Conduct similarly provide that:

A lawyer's integrity requires personal conduct that does not impair the rendering of professional service of the highest skill and ability; acting with candor; preserving confidences; treating others with respect; and acting with conviction and courage in advocating a lawful cause. Candor requires both the expression of the truth and the refusal to mislead others in speech and demeanor. . . .

2. Pre-trial proceedings. A lawyer should use pre-trial procedures, including discovery, solely to develop a case for settlement or trial and not to harass an opponent or delay a case.

67.     The evidence admitted at trial establishes that Plaintiffs' attorney Mark Rubin violated the principles set forth above.

68.     Specifically, Mark Rubin repeatedly testified to facts that are refuted by the record.  For example, Mark Rubin testified at trial that Noelle Nichols' August 29, 2016 follow up request for mezzanine loan information somehow prevented Plaintiffs from closing the UBS loan on August 31, 2016.  (Trial Tr. at 1206:14-1207:17.)  This testimony was untrue and Mark Rubin knew it was untrue at the time he provided it.  Mark Rubin's own contemporaneous emails reflect that Mark Rubin knew about the mezzanine loan request no later than August 18, 2016 and that Mark Rubin, on his own, pushed the UBS closing date past August 31, 2016 due to "complications" that had nothing to do with Noelle Nichols' follow-up request for mezzanine loan information on August 29, 2016.  (Trial Tr. at 1224:10-1228:15; *see also id.* at 414:3-416:23; J-270; J-464; J-469; J-470; J-471; J-474; J-475; J-476; J-513.)

69. Similarly, given Ladder Capital's statement in November 2017 that it was still interested in refinancing the loan "per the terms" of its April 2017 term sheet with Plaintiffs, Mark Rubin had no factual basis for testifying that Secured Lender's June 2017 purchase of the note in any way caused the terms of the potential Ladder Capital refinancing to "change." (*See supra* ¶ 62 (citing J-1133 & Trial Tr. at 1195:3-1197:12).)

70. Moreover, Mark Rubin is the primary source of knowledge concerning the material events at issue in Plaintiffs' Complaint, First Amended Complaint, and the SAC. There is no evidence in the record that any Plaintiff reviewed any of the complaints in this matter before they were filed. (*See* Trial Tr. at 120:2-5 (Mr. Lynch testifying that he did not read the complaint in this matter); Eidel Dep. at 50:23-51:2.) There is no evidence in the record that any Plaintiff communicated with any of the Defendants.

71. Instead, the substantial record in this case demonstrates that Mark Rubin was primarily responsible for communicating with Defendants, UBS, Calmwater, and Mitchell Williams, and that Mark Rubin is therefore the only witness on Plaintiffs' side with direct and personal knowledge of the material events at issue in this case. (*See* Rubin Dep. at 106:10-107:8, 108:1-109:1, 112:16-114:15; Eidel Dep. at 148:24-150:17, 156:21-158:8, 173:15-174:9, 175:23-176:4, 181:13-182:17, 188:13-21, 191:10-194:12, 196:22-197:12, 210:5-22, 271-272, 290:13-293:3, 293:8-295:10, 297:16-298:23, 299:17-300:21, 308:5-309:17, 310:8-312:6, 317:9-13, 330:13-331:20, 339:12-24, 348:20-349:24, 353:21-354:19, 356:15-358:22; Trial Tr. at 538:5-11, 875:10-876:3, 1058:18-1060:5; Beard Dep. at 81:6–82:10.)

72. Moreover, and as detailed more fully in Lender Defendants' Proposed Findings of Fact and Conclusions of Law, Mark Rubin knew at the time Plaintiffs filed this adversary proceeding that:

    a.   No act or omission by a Lender Defendant prevented Plaintiffs from closing on a loan with UBS prior to the Maturity Date;

    b.   No act or omission by a Lender Defendant prevented Plaintiffs from closing on a loan with UBS after the Maturity Date;

    c.   No act or omission by a Lender Defendant caused Plaintiffs' Maturity Date default;

    d.   There was no September 30, 2016 Calmwater loan closing date;

    e.   No act or omission by a Lender Defendant prevented Plaintiffs from closing any Calmwater loan on September 30, 2016;

    f.   No act or omission by a Lender Defendant prevented Plaintiffs from closing any Calmwater loan at any other date; and

    g.   No act or omission by a Lender Defendant caused Mitchell Williams to terminate its lease.

(J-906 ¶¶ 3, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 74, 79, 80, 81, 84, 85, 86, 89, 90, 91, 92, 93, 95, 96, 97, 98, 99, 100, 128.)

73.    Mark Rubin also knew that the above facts were true at the time Plaintiffs filed their first amended and their operative second amended complaint. (J-914 ¶¶ 3, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 76, 81, 82, 83, 86, 87, 88, 91, 92, 93, 94, 95, 97, 98, 99, 100, 101, 102, 130; J-083 ¶¶ 3, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 76, 81, 82, 83, 86, 87, 88, 91, 92, 93, 94, 95, 97, 98, 99, 100, 101, 102, 130.)

74.    Notwithstanding that knowledge, Mark Rubin continued pursuing Plaintiffs' unfounded claims through a protracted discovery process that included extensive discovery, contested motion practice, a lengthy trial, and substantial post-trial proceedings.

75.    Lender Defendants therefore ask the Court to order Mark Rubin to show cause as to why he did not violate 28 U.S.C. § 1927 by unreasonably and vexatiously multiplying these

proceedings based on theories that he knew to be baseless at the time Plaintiffs filed this adversary proceeding.

## V.    ***CONCLUSION***

WHEREFORE, Lender Defendants request that the Court: (i) enter a directed judgment in their favor on Counts I, II, III, IV, V, VII, VIII, and IX; (ii) enter an Order requiring Mark Rubin to show cause as to why he did not violate 28 U.S.C. § 1927 by unreasonably and vexatiously multiplying these proceedings based on theories that he knew to be baseless at the time Plaintiffs filed this adversary proceeding; (iii) grant Lender Defendants their attorneys' fees and costs with respect to which Lender Defendants shall file a fee petition within 21 days of the Court's Order on this Motion; and (iv) grant Lender Defendants such other and further relief this Court deems just and proper.

Dated:  June 12, 2020
        Wilmington, Delaware

Respectfully submitted,

**DUANE MORRIS LLP**

*/s/ Sommer L. Ross*
Lawrence J. Kotler (DE 4181)
Sommer L. Ross (DE 4598)
222 Delaware Avenue, Suite 1600
Wilmington, Delaware  19801-1659
Tel: 302-657-4900
Fax: 302-657-4901
Email: ljkotler@duanemorris.com
Email: slross@duanemorris.com

-and-

Paul E. Chronis (admitted *pro hac vice*)
Elinor H. Murárová (admitted *pro hac vice*)
190 South LaSalle Street, Suite 3700
Chicago, Illinois 60603
Telephone: (312) 499-6700
Facsimile: (312) 499-6701
Email: pechronis@duanemorris.com

Email: ehart@duanemorris.com

-and-

Meagen E. Leary (admitted *pro hac vice*)
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105
Telephone: (415) 957-5000
Facsimile: (415) 520-0291
E-mail: meleary@duanemorris.com

*Counsel to Wells Fargo Bank, N.A., in its capacity as Trustee for the Registered Holders of Comm 2006-C8 Commercial Mortgage Pass Through Certificates, Berkadia Commercial Mortgage, LLC, LNR Partners, LLC, Little Rock-400 West Capitol Trust, and Taconic Capital Advisors L.P.*